FRIENDS OF the WILD SWAN,
INC., et al., Plaintiffs,

v.

UNITED STATES FOREST SERVICE,
et al., Defendants.

Civil No. 94–1455–JO.

United States District Court,
D. Oregon.

May 2, 1997.

Gary Keith Kahn, Reeves Kahn & Eder, Portland, OR, Jack R. Tuholske, Missoula, MT, for plaintiffs.

Thomas C. Lee, U.S. Attys. Office, Portland, OR, Sandra B. Zellmer, Stephanie M. Parent, U.S. Dept. of Justice, Environment & Natural Resources, Washington, DC, for defendants.

Scott W. Horngren, Shay S. Scott, Michael E. Haglund, Haglund & Kirtley, Portland, OR, for intervenor-defendants.

### OPINION AND ORDER

ROBERT E. JONES, District Judge.

On December 1, 1994, plaintiffs Friends of the Wild Swan, Inc., Alliance for the Wild Rockies, Inc., Swan View Coalition, and Kettle Range Conservation Group filed suit against the United States Forest Service and various individual federal employees alleging three violations of the National Forest Management Act (NFMA), 16 U.S.C. §§ 1600 to 1687, and its implementing regulations and one violation of the Administrative Procedures Act (APA), 5 U.S.C. §§ 701, 706, resulting from the Forest Service's alleged failure to implement forest management practices that adequately protect the bull trout. Specifically, plaintiffs allege that defendant Forest Service: (1) violated 16 U.S.C. § 1604(g)(3)(B) and 36 C.F.R. § 219.19 by not maintaining biological diversity and not maintaining viable populations of the bull trout; (2) violated 16 U.S.C. § 1604(g)(3)(E) by failing to protect aquatic habitat where timber harvest practices adversely affect bull trout; (3) violated the NFMA by failing to amend applicable regional guides and Forest Plans in light of new information on the declining status of the bull trout; and (4) acted arbitrarily and capriciously in violation of the federal APA by failing to protect the bull trout.

F.H. Stoltze Land and Lumber Co. intervened in this action as a defendant. This case is now before me on the parties' cross motions (# 177–1, # 190, and # 197) for summary judgment and on plaintiffs' motion (# 177–2) to bifurcate this case's liability and proceedings. For the reasons discussed below, I hereby GRANT plaintiffs' motion (# 177–1) for summary judgment in part and DENY it in part, GRANT defendant's and defendant-intervenor's motions (# 190, # 197) in part and DENY them in part, and GRANT plaintiff's motion to bifurcate the liability and remedy portions of this proceeding regarding PACFISH.

### THE NATIONAL FOREST MANAGEMENT ACT AND IMPLEMENTING REGULATIONS

Congress enacted the National Forest Management Act (NFMA) to maintain "a natural resource conservation posture that will meet the requirements of our people in perpetuity." 16 U.S.C. § 1600(6). However, Congress also recognized that "management

of the Nation's renewable resources is highly complex", 16 U.S.C. § 1600(1), and so recognized that a renewable resource program for this nation's forests

> must be based on a comprehensive assessment of present and anticipated uses, demand for, and supply of renewable resources from the Nation's public and private forests and rangelands, through analysis of environmental and economic impacts, coordination of multiple use and sustained yield opportunities as provided in the Multiple–Use Sustained–Yield Act of 1960 (74 Stat. 215; 16 U.S.C. 528–531), and public participation in the development of the program * * *.

16 U.S.C. § 1600(3).

At issue here are the NFMA's requirements regarding land and resource management plans, also known as forest plans. The Act requires that the Secretary of Agriculture, "utilizing information available to the Forest Service and other agencies within the Department of Agriculture" to "prepare and transmit to the President a recommended Renewable Resource Program * * *." 16 U.S.C. § 1602. As part of that Program, the Secretary of Agriculture "shall develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System * * *." 16 U.S.C. § 1604(a). Moreover, in the development of these plans, "the Secretary shall use a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences." 16 U.S.C. § 1604(b).

In developing the land and resource management plans, the Secretary must assure that the plans fulfill the Multiple–Use, Sustained–Yield Act of 1960 (MUSYA). 16 U.S.C. § 1604(e). MUSYA declared Congress's policy "that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528. It authorized the Secretary of Agriculture "to develop and administer the renewable surface resources of the national forests for multiple use and sustained yield of the several products and services obtained therefrom" and specifically authorized the

establishment of wilderness areas. 16 U.S.C. § 529.

Under MUSYA, "multiple use" is:

> The management of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; that some land will be used for less than all of the resources; and harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land, with consideration being given to the relative values of the various resources, and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output.

16 U.S.C. § 531(a). "Sustained yield of the several products and services" is "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the national forests without impairment of the productivity of the land." 16 U.S.C. § 531(b).

MUSYA, in turn, is supplemental to 16 U.S.C. § 475, which established the National Forests. 16 U.S.C. § 528. Section 475, provides that:

> No national forest shall be established, except to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States; but it is not the purpose or intent of these provisions, or of said section, to authorize the inclusion therein of lands more valuable for the mineral therein, or for agricultural purposes, than for forest purposes.

16 U.S.C. § 475.

To effectuate all of these cross references under the NFMA, the Secretary must "form one integrated plan for each unit of the Na-

tional Forest System," 16 U.S.C. § 1604(f)(1), and must revise the integrated plan "from time to time when the Secretary finds conditions in a unit have significantly changed, but at least every fifteen years * * *." 16 U.S.C. § 1604(f)(5).

The NFMA also requires the Secretary of Agriculture to promulgate regulations governing land and resource management plans. Specifically, the Act requires that the regulations: ensure that land and resource management plans comply with the National Environmental Policy Act (NEPA), 16 U.S.C. § 1604(g)(1); specify guidelines for obtaining certain information, *id.* § 1604(g)(2); and specify "guidelines for land management plans developed to achieve the goals of the Program which—"

> (A) insure consideration of the economic and environmental aspects of various systems of renewable resource management, including the related systems of silviculture and protection of forest resources, to provide for outdoor recreation (including wilderness), range, timber, watershed, wildlife, and fish;

> (B) *provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives,* and within the multiple-use objectives of a land management plan adopted pursuant to this section, provide, where appropriate, to the degree practicable, for steps to be taken to preserve the diversity of tree species similar to that existing in the region controlled by the plan;

> (C) insure research on and (based on continuous monitoring and assessment in the field) evaluation of the effects of each management system to the end that it will not produce substantial and permanent impairment of the productivity of the land;

> (D) permit increases in harvest levels based on intensified management practices, such as reforestation, thinning, and tree improvement if (i) such practices justify increasing the harvest in accordance with the Multiple–Use Sustained–Yield Act of 1960, and (ii) such harvest levels are decreased at the end of each planning peri-

od if such practices cannot be successfully implemented or funds are not received to permit such practices to continue substantially as planned;

> (E) *insure that timber will be harvested from National Forest System lands only where—*

>> (i) *soil, slope, or other watershed conditions will not be irreversibly damaged;*

>> (ii) there is assurance that such lands can be adequately restocked within five years after harvest;

>> (iii) *protection is provided for streams, streambanks, shorelines, lakes, wetlands, and other bodies of water from detrimental changes in water temperatures, blockages of water courses, and deposits of sediment, where harvests are likely to seriously and adversely affect water conditions or fish habitat;* and

>> (iv) the harvesting system to be used is not selected primarily because it will give the greatest dollar return or the greatest unit output of timber; and

> (F) insure that clearcutting, seed tree cutting, shelterwood cutting, and other cuts designed to regenerate an even-aged stand of timber will be used as a cutting method on National Forest System lands only where—

>> (i) for clearcutting, it is determined to be the optimum method, and for other such cuts it is determined to be appropriate, to meet the objectives and requirements of the relevant land management plan;

>> (ii) the interdisciplinary review as determined by the Secretary has been completed and the potential environmental, biological, esthetic, engineering, and economic impacts on each advertised sale area have been assessed, as well as the consistency of the sale with the multiple use of the general area;

>> (iii) cut blocks, patches, or strips are shaped and blended to the extent practicable with the natural terrain;

>> (iv) there are established according to geographic areas, forest types, or other suitable classifications the maximum size limits for areas to be cut in one harvest

operation, including provision to exceed the established limits after appropriate public notice and review by the responsible Forest Service officer one level above the Forest Service officer who normally would approve the harvest proposal: Provided, That such limits shall not apply to the size of areas harvested as a result of natural catastrophic conditions such as fire, insect and disease attack, or windstorm; and

(v) such cuts are carried out in a manner consistent with the protection of soil, watershed, fish, wildlife, recreation, and esthetic resources, and the regeneration of the timber resource.

16 U.S.C. § 1604(g) (emphasis added).

Once a land management plan has become effective, "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans." 16 U.S.C. § 1604(i). Moreover, if a land management plan is revised, all such plans, permits, contracts, and other instruments must be revised as soon as practicable, "subject to valid existing rights." Id.

The Forest Service's regulations implementing these provisions of the NFMA state that land and resource management plans "guide all natural resource management activities and establish management standards and guidelines for the Nation Forest System. They determine resource management practices, levels of resource production and management, and the availability and suitability of lands for resource management." 36 C.F.R. § 219.1(b). One of the principles on which such plans are based, moreover, is the "[r]ecognition that the National Forests are ecosystems and their management for goods and services requires an awareness and consideration of the interrelationships among plants, animals, soil, water, air, and other environmental factors within such ecosystems." 36 C.F.R. § 219.1(b)(3).

Under the Forest Service's regulations, planning occurs at three levels: national, regional, and forest. 36 C.F.R. § 219.4(a). Regional and forest planning make use of an interdisciplinary team, which "shall integrate knowledge of the physical, biological, economic and social sciences, and the environmental design arts in the planning process." 36 C.F.R. § 219.5(a). In addition, each Forest Service region must have a regional guide, 36 C.F.R. § 219.8(a), and these guides "shall provide standards and guidelines for addressing major issues and management concerns which need to be considered at the regional level to facilitate forest planning." Id.

Forest plans must assess "[t]he expected outputs for the planning periods," including "recreation and wilderness use, wildlife and fish, protection and enhancement of soil, water, and air, and preservation of aesthetic and cultural resource values." 36 C.F.R. § 219.12(g)(1). Moreover, "[t]he minimum requirements for integrating individual forest resource planning into the forest plan" include provisions for the fish and wildlife resource. 36 C.F.R. §§ 219.13, 219.19. Specifically, Forest Service regulations require that:

Fish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrate species in the planning area. For planning purposes, a viable population shall be regarded as one which has the estimated numbers and distribution of reproductive individuals to insure its continued existence is well distributed within the planning area. In order to insure that viable populations will be maintained, habitat must be provided to support, at least, a minimum number of reproductive individuals and that habitat must be well distributed so that those individuals can interact with others in the planning area.

36 C.F.R. § 219.19 (emphasis added).

Each alternative that the Forest Service considers must meet seven requirements. 36 C.F.R. § 219.19(a). First, the forest planners must identify and select indicator species. Id. § 219.19(a)(1). Where appropriate, these indicator species should represent threatened and endangered species in the planning area; "species with special habitat needs that may be influenced significantly by planned management programs; species commonly hunted, fished, or trapped; non-

game species of special interest; and additional plant or animal species selected because their population changes are believed to indicate the effects of management activities on other species of selected major biological communities or on water quality." *Id.*

Second, "[p]lanning alternatives shall be stated and evaluated in terms of both amount and quality of habitat and of animal population trends of the management indicator species." *Id.* § 219.19(a)(2). Third, "[b]iologists from State fish and wildlife agencies and other Federal agencies shall be consulted in order to coordinate planning for fish and wildlife, including opportunities for the reintroduction of extirpated species." *Id.* § 219.19(a)(3). Fourth, "[a]ccess and dispersal of hunting, fishing, and other visitor uses shall be considered." *Id.* § 219.19(a)(4).

Fifth, "[t]he effects of pest and fire management on fish and wildlife populations shall be considered." *Id.* § 219.19(a)(5). Sixth, "[p]opulation trends of the management indicator species will be monitored and relationships to habitat changes determined." *Id.* § 219.19(a)(6). Finally,

> Habitat determined to be critical for threatened and endangered species shall be identified, and measures shall be prescribed to prevent the destruction or adverse modification of such habitat. Objectives shall be determined for threatened and endangered species that shall provide for, where possible, their removal from listing as threatened and endangered species through appropriate conservation measures, including the designation of special areas to meet the protection and management needs of such species.

*Id.* § 219.19(a)(7).

In addition, *"[f]orest planning shall provide for diversity of plant and animal communities and tree species consistent with the overall multiple-use objective of the planning area.* Such diversity shall be considered throughout the planning process." 36 C.F.R. § 219.26 (emphasis added). The Forest Service has defined "diversity" as "[t]he distribution and abundance of different plant and animal communities and species in the area covered by a land and resource management plan." *Id.* § 219.3.

## FACTS

### A. Bull Trout

Bull trout (*Salvelinus confluentus*) are native to the Northern Rockies and Pacific Northwest. Bull trout were once plentiful throughout the Northwest but have been extirpated from significant portions of their historic range. Bull trout inhabit areas within Montana, Idaho, Oregon, Washington, and Nevada; current information indicates that they have become extinct in California. The population of bull trout in the coterminus United States faces interrelated threats in the majority of its range.

Bull trout exhibit four life history forms: resident, fluvial, adfluvial, and anadromous. Resident bull trout are nonmigratory and spend their entire life cycle in the same or nearby streams. They do not move as migratory bull trout do, and do not readily recolonize vacant habitats. Thus, resident forms of bull trout are more likely to be affected by habitat degradation, competition, and predation by exotic species than other forms of bull trout.

Fluvial, adfluvial, and anadromous bull trout are migratory. They spawn in tributary streams and migrate as juveniles either to a lake (adfluvial), large river (fluvial), or salt water (anadromous) to mature, then return to small streams to reproduce. Large migratory bull trout can exceed 30 pounds. These migratory forms of bull trout are essential to the survival of the bull trout because migration facilitates vital genetic interchange, enables recolonization of vacant habitats, and allows adults access to new habitat. The persistence of migratory bull trout and maintenance or reestablishment of stream migration corridors is essential to the viability of the species as a whole.

Migratory bull trout have been restricted or eliminated from most of their habitat due to human-caused stream habitat alterations, including dams, irrigation diversions, detrimental changes in water quality, increased water temperature, and the alternation of natural stream flow patterns from logging, mining, and grazing.

The Columbia, Snake, and Clark Fork Rivers, among others, once supported large, migratory bull trout. Numerous local populations were also distributed throughout tributary streams. However, migratory fluvial bull trout are no longer found in most of the large rivers within the range of the coterminus United States population of the fish. Moreover, many fluvial and adfluvial bull trout are isolated from each other. Most remaining isolated bull trout populations are resident fish restricted to headwater areas of a few suitable tributaries. Such isolated bull trout populations can be at risk of extirpation and are not likely to persist.

Bull trout in the coterminus United States is declining in much of its range. The Washington Department of Wildlife estimated that of the populations evaluated, 43% are at a moderate to high risk of extinction. The U.S. Fish and Wildlife Service found that, given more comprehensive risk criteria, a much higher percentage of bull trout in the State of Washington would be at moderate to high risk of extinction. In addition, in Washington bull trout have been extirpated from a significant portion of the Columbia River Basin, and the remaining distribution is highly fragmented, with most populations considered to be at moderate to high risk of extinction.

A study that the Montana Department of Fish, Wildlife, and Parks commissioned concluded that 90% of the presently-occupied bull trout streams are at moderate to high risk of extinction. In Nevada, only one isolated population remains in the Jarbridge River, which faces a moderate to high risk of extinction. In Idaho, of the 35 bull trout populations that the Forest Service evaluated in 1993, 69% were declining and none were increasing.

Bull trout are extremely sensitive to changes in their habitat. Indeed, bull trout are highly sensitive at all life stages to environmental disturbances and thus are particularly susceptible to the impacts caused by man's alteration of the environment. They require clean cold water, free of barriers to migration, with clean spawning gravel in headwater creeks. Blockage of migratory corridors prevents re-establishment of extirpated populations. However, defendants and defendant-intervenor dispute the extent to which increases in temperature have actually affected the bull trout and argue that specific temperature requirements have not yet been established for the species.

Bull trout habitat can be affected by logging, road construction, mining, and grazing. These activities can cause accumulation of sediment and organic material in the gravel bed habitat that bull trout use for spawning and rearing. Streamside logging can alter banks, eliminate trees that are necessary for pool formation, and cause detrimental increases in water temperature. Adverse impacts from logging, road construction and related land management practices have been documented throughout the species' range in the United States.[1] Moreover, the Forest Service has admitted that logging, road construction, and grazing activities that it permits can have adverse impacts on bull trout and their habitat.[2]

In addition, dams on the Columbia, Snake, and Clark Fork Rivers have contributed to the fragmentation of the bull trout's habitat, declines in its population, and local extirpations. These dams have also contributed to population isolation, which prevents genetic interchange.

Impacts associated with grazing have also contributed to the decline in bull trout populations throughout its range. Grazing can

1. Defendant-intervenor claims that it disputes these facts but asserts only that the Forest Service's land management strategies proscribe habitat-destroying activities. The effectiveness of these strategies is precisely what is at issue in this litigation, and I do not otherwise understand defendant-intervenor to assert that logging, road construction, and grazing *cannot* cause the accumulation of sediment and organic matter that can affect bull trout habitat.

2. Again, defendant-intervenor claims that it disputes these facts. However, it only asserts that INFISH is designed to prevent these adverse effects. The effectiveness of INFISH is again precisely what is at issue in this case, and I do not understand defendant-intervenor to assert that the permitted activities *cannot* have adverse impacts.

destroy stream banks, eliminate riparian vegetation, and degrade water quality. Defendant · Forest Service asserts, however, that when properly conducted, grazing does not adversely impact aquatic habitat.

Mining can have adverse impacts on aquatic areas and has adversely affected bull trout habitat in Idaho, Montana, Oregon, and Washington. Sport fishing, poaching, and competition from non-native fish can also affect the bull trout.

The population of bull trout in the coterminus United States thus face multiple threats. These threats are synergistic, and multiple threats to the species may increase the species' overall risk. Even healthy subpopulations of the bull trout may face threats. Moreover, once isolated, bull trout face a higher probability of extinction, and thus it is unlikely that isolated populations will persist.

Federal and state laws governing fish conservation and water quality have not eliminated habitat degradation and population fragmentation. Moreover, habitat alteration in upland areas and headwaters or intermittent streams that do not have bull trout populations can adversely affect bull trout in downstream habitat. Defendant-intervenors assert, however, that riparian zones buffer the effect of upland activities on downstream habitat and that INFISH is designed to lessen the likelihood of such adverse effects.

Defendant Forest Service admits that it manages some of the bull trout's habitat and that the majority of remaining bull trout habitat is on or adjacent to land that it manages. Moreover, it admits that forest management practices are one of the causes of decline in the bull trout population.

The Forest Service classifies bull trout as a sensitive species. According to the Forest Service Manual, "sensitive species" are those species whose viability is of concern because they have significant current or predicted downward trends in numbers or density, or because there is a significant downward trend in their current or predicted habitat that would reduce their distribution.

## B. U.S. Forest Service and Its Operations

The Forest Service is an agency within the United States Department of Agriculture and is responsible for the management of lands within the National Forest System. Three national forest regions are involved in this suit. Region 6 encompasses National Forests in Washington and Oregon and is headquartered in Portland, Oregon.

In that region, the Forest Service manages bull trout habitat on both the east and west sides of the Cascade Mountains and in the central and eastern portions of both states. Moreover, a number of National Forests in Region 6 presently provide or influence habitat for bull trout, including the Okanogan, Wenatchee, Mt. Baker–Snoqualimie, Olympic, Colville, Gifford Pinchot, Mt. Hood, Umatilla, Wallowa–Whitman, Ochoco, Malheur, Deschutes, Willamette, Fremont, and Winema forests. The parties dispute whether the Rogue River and Umpqua National Forests provide or influence habitat for bull trout.

Defendant John Lowe was Regional Director for Region 6 at the time plaintiffs filed this suit, but Robert Williams became Acting Regional Director for Region 6 on March 3, 1996. Defendant Lowe's predecessor-in-interest approved the forest plans at issue in this suit.

Region 1 encompasses, *inter alia*, National Forests in northern Idaho and western Montana and is headquartered in Missoula, Montana. National Forests in this region presently providing or influencing bull trout habitat include the Nez Perce, Idaho Panhandle, Clearwater, Kootenai, Flathead, Lolo, Bitterroot, Deer Lodge, and Helena. Defendant Dave Jolly was Regional Forester for Region 1 at the time this suit was filed, but Hal Salwasser became Regional Forester for that region on June 25, 1995. Defendant Jolly's predecessor-in-interest approved forest plans at issue in this lawsuit.

Region 4 encompasses, *inter alia*, National Forests in western, southern, and central Idaho and northern Nevada. In that region, the National Forests presently providing or influencing bull trout habitat include the Salmon, Payette, Challis, Boise, Sawtooth,

and Humboldt. Defendant Dale Bosworth is Regional Forester for Region 4, and his predecessor in interest approved forest plans at issue in this lawsuit.

After Congress enacted the NFMA, forest plans for the National Forests in Regions 1, 4, and 6 were prepared and adopted. In addition, regional guides or plans have been adopted for these regions since the NFMA's enactment. Forest plans, as amended, and project decisions govern activities within the National Forest system.

After plaintiffs filed this lawsuit, defendant Forest Service approved two decisions that amended the regional guides for Regions 1, 4, and 6 and the forest plans for the National Forests at issue. These decisions are known as PACFISH, approved on February 25, 1995, and INFISH (Inland Native Fish Strategy), approved on July 28, 1995. PACFISH amended four regional guides and fifteen forest plans, while INFISH amended three regional guides and 22 forest plans. Both plans were designed as interim strategies expected to last 18 months. PACFISH was formally extended when its 18–month term expired, and INFISH, which had no firm expiration date, was extended administratively. Thus, both strategies remain in effect.

The parties dispute whether, in connection with INFISH, the Forest Service admitted that as of March 1995 the forest plans' standards and guidelines did not offer adequate protection for the bull trout. The parties also dispute whether PACFISH mentions or addresses bull trout.

PACFISH establishes goals for watershed, riparian and stream channel conditions to protect and restore habitat. Riparian management objectives (RMOs), delineation of Riparian Habitat Conservation Areas (RHCAs), and establishment of standards and guidelines to govern management actions that will impact fish habitat are the means of achieving these goals. The RMOs establish measurable habitat parameters that define good fish habitat and provide criteria against which progress toward attainment of the riparian goals is measured.

The Forest Service asserts that PACFISH precludes management activities that would adversely affect fish species in RHCAs, such as timber harvest, roads, and grazing, and it restricts other nearby projects that would degrade RHCAs. RHCAs consist of either 300–foot buffers or alternative topographically-defined buffers for fish-bearing streams, and lesser buffers for non-fish-bearing streams, lakes, and other water bodies.

INFISH provides interim protections for resident fish species in 22 National Forests in Regions 1, 4, and 6. INFISH amends the forest plans and guides only in those forests that PACFISH does not cover. Like PACFISH, INFISH establishes riparian management objectives, standards and guidelines, and monitoring requirements for all proposed and new projects within or affecting RHCAs in the planning area, as well as to certain ongoing projects in areas designated as priority watersheds. Ongoing projects within these watersheds have, according to the Forest Service, been reviewed to determine their effects on fish habitat and modified as necessary to avoid adverse impacts.

In addition to PACFISH and INFISH, on April 20, 1994, the Forest Service adopted the Northwest Forest Plan and its Aquatic Conservation strategy, which amended the forest plans and guides in Region 6 within the range of the Northern Spotted Owl. 59 Fed.Reg. 18788 (April 20, 1994). The Forest Service specifically found that the adoption of these amendments would produce at least an 80% likelihood of providing habitat capable of supporting stable populations of each of the assessed fish races/stocks/species—including bull trout—across federal lands with populations that are well distributed when measured against historic ranges. With respect to bull trout, moreover, Alternative 9—the alternative adopted—was predicted to produce an 85% likelihood of providing sufficient habitat for bull trout. The U.S. District Court for the Western District of Washington upheld the Northwest Forest Plan amendments in 1995, rejecting NFMA, NEPA, and other challenges. *Seattle Audubon Soc. v. Lyons,* 871 F.Supp. 1291 (W.D.Wash.1994), *aff'd* 80 F.3d 1401 (9th Cir. 1996).

In addition, in 1994 the Forest Service began work on a proposal to adopt a second long-term ecosystem strategy within the Columbia River Basin, which is now known as the Interior Columbia Basin Ecosystem Management Project (ICBEMP). *See* 61 Fed.Reg. 47859, 47859 (Sept. 11, 1996) (noting that in February 1994 "the Bureau of Land Management and the Forest Service proposed to develop and adopt a coordinated ecosystem management strategy for national forests and public lands east of the Cascade Mountains in Oregon and Washington" and citing 59 Fed.Reg. 4680 (Feb. 1, 1994)). "The ICBEMP strategy will include direction which will protect and enhance aquatic ecosystems for anadromous fish and inland native trout and terrestrial ecosystems." *Id.* The Forest Service expects to release draft Environmental Impact Statements (EISs) for the ICBEMP strategy by June 1997 and to release final EISs and a Record of Decision approximately one year later. 62 Fed.Reg. 2176, 2176 (Jan. 15, 1997).

The National Forest Plan, INFISH, and PACFISH are mutually exclusive—that is, only one strategy governs a given watershed. However, because the strategies address watersheds, their boundaries do not match those of the designated National Forests. Thus, a single forest plan may have been amended by one, two, or even all three strategies, but multiple amendments would have no overlap in the watersheds they address. The ICBEMP, if adopted, would supplant PACFISH and INFISH but would not supplant the National Forest Plan.

## C. Bull Trout and the Endangered species Act

Plaintiffs also filed suit in this court with respect to the bull trout against the U.S. Fish and Wildlife Service. *Friends of the Wild Swan v. U.S. Fish & Wildlife Service,* CV 94–1318–JO. As a result of that suit, the U.S. Fish and Wildlife Service determined that listing under the federal Endangered Species Act was warranted for the Klamath River and Columbia River population segments of the bull trout species. Moreover, plaintiffs and the U.S. Fish and Wildlife Service have entered a stipulation whereby, by June 10, 1997, the latter will issue a proposed rule to list the two population segments of bull trout pursuant to the Endangered Species Act. Stipulation, *Friends of the Wild Swan v. U.S. Fish & Wildlife Service,* No. 94–1318 (D. Or. April 11, 1997).

## DISCUSSION

### A. Legal Standards

#### 1. Summary Judgment

Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). If the moving party shows that there are no genuine issues of material fact, the non-moving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact. *United Steelworkers of Amer. v. Phelps Dodge Corp.,* 865 F.2d 1539, 1542 (9th Cir.), *cert. denied,* 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989).

The substantive law governing a claim determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). Reasonable doubts as to the existence of a material factual issue are resolved against the moving party. *Id.* at 631. Inferences drawn from facts are viewed in the light most favorable to the non-moving party. *Id.* at 630–31.

Here, the issues presented are almost entirely legal: Are the Forest Service's actions in adopting the Northwest Forest Plan, PACFiSH, and INFISH arbitrary and capricious and/or contrary to the NFMA and its implementing regulations in violation of the federal APA, based on the administrative records for those decisions? Because this is a record review case, the relevant facts are what the record contains. Therefore, summary judgment is appropriate.

## 2. Review under the Federal APA

The Forest Service's decisions pursuant to the NFMA can be reviewed under the APA's "arbitrary and capricious" standard. *Nevada Land Action Ass'n v. U.S. Forest Service,* 8 F.3d 713, 716–17 (9th Cir.1993). Under this standard, the reviewing court must set aside the agency's decision of it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

"A decision is arbitrary and capricious if the agency 'has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm'n,* 92 F.3d 940, 942 (9th Cir.1996) (quoting *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983)). An agency action is also arbitrary and capricious if the agency fails to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n.,* 463 U.S. at 43, 103 S.Ct. at 2866 (citations omitted). Finally, an agency must set forth clearly the grounds on which it acted. *Atchison T. & S.F. Ry. v. Wichita Bd. Of Trade,* 412 U.S. 800, 807, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350 (1973).

"Review under the arbitrary and capricious standard is narrow, and the reviewing court may not substitute its judgment for that of the agency." *O'Keeffe's, Inc.,* 92 F.3d at 942 (citing *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 376, 109 S.Ct. 1851, 1860, 104 L.Ed.2d 377 (1989)). Deference to the agency is especially strong "when

questions of scientific methodology are involved." *Inland Empire Public Lands Council v. U.S. Forest Service,* 88 F.3d 754, 760 (9th Cir.1996) (citing *Inland Empire Public Lands Council v. Schultz,* 992 F.2d 977, 981 (9th Cir.1993)). Nevertheless, the reviewing court must undertake a "thorough, probing, in-depth review" of the agency's decision. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971).

## B. The Forest Service's Duties To Ensure Viable Populations of Bull Trout Under the NFMA

### 1. Ninth Circuit Jurisprudence

Plaintiffs allege that the Forest Service has failed to amend forest management plans and their aquatic habitat protections to adequately maintain viable populations of bull trout in violation of the NFMA and of 36 C.F.R. § 219.19(a).[3] The Ninth Circuit recently addressed the Forest Service's duties with respect to maintaining viable populations of existing native species. Noting that "the NFMA imposes substantive duties on the Forest Service," including "the duty to 'provide for diversity of plant and animal communities,'" 16 U.S.C. § 1604(g)(3)(B), the Ninth Circuit recognized that under 36 C.F.R. § 219.19 the Forest Service has a "duty to ensure viable, or self-sustaining populations * * *." *Inland Empire Public Lands Council,* 88 F.3d at 759. The Ninth Circuit also emphasized that this duty "applies with special force to 'sensitive' species." *Id.* (citing *Oregon Natural Resources Council v. Lowe,* 836 F.Supp. 727, 733 (D.Or.1993), *aff'd* 109 F.3d 521 (9th Cir.1997); *Forest Conservation Council v. Espy,* 835 F.Supp. 1202, 1206 (D.Idaho 1993), *aff'd* 42 F.3d 1399 (9th Cir.1994)). Here, the parties agree that bull trout is a sensitive species, and thus the Forest Service *does* have a duty to ensure

---

**3.** The Northwest Forest Plan, INFISH, and PACFISH all rely on aquatic habitat management strategies as the means of providing for viable populations. Therefore, plaintiffs' first and second claims require essentially the same analysis and are collapsed into this one discussion.

In addition, on the basis of plaintiff's Brief in Support of Motion for Summary Judgment, I

interpret plaintiff's third claim to assert that *because* PACFISH and INFISH are inadequate amendments, the Forest Service has failed to amend the applicable forest plans in violation of the NFMA—*not* as an assertion that *even if* PACFISH and INFISH were adequate at the time adopted, additional amendment is required. Therefore, plaintiffs' third claim also collapses into the first two.

viable populations of that species within the forests at issue.

In *Inland Empire*, the Ninth Circuit specifically addressed the issue of "what type of population viability analysis the Service must perform in order to comply with Regulation 219.19." *Id.* Starting with the regulation's plain language, it noted "that the Forest Service may discharge its duties through habitat management as long as 'habitat [is] provided to support, at least, a minimum number of reproductive individuals and that habitat [is] well distributed so that those individuals can interact with others in the planning area.'" *Id.* at 761 (quoting 36 C.F.R. § 219.19). Moreover, it held that "[t]he Service is entitled to rely on reasonable assumptions in its environmental analyses." *Id.*

Nevertheless, the Ninth Circuit based its "arbitrary and capricious" analysis on the Forest Service's viability analyses for individual species. Thus, the court upheld the Forest Service's methodology for its viability analysis for the black-backed woodpecker, lynx, fisher, and boreal owl. *Id.* For these species, the Forest Service had consulted field studies to determine how many acres an individual of each species needed to survive and the percentage of acreage use for nesting, feeding, denning, and so on; had assumed that those percentages would hold true regardless of the size of the individual's territory; had examined each proposed alternative to see how many acres of each type of habitat would remain after the sale and timber harvest; had determined what percentage of the decision area that the remaining types of habitat constituted; and then concluded that "a species would remain viable as long as the threshold percentage of each type of habitat remaining in the chosen alternative was greater than the percentage required for that species to survive * * *." *Id.* at 759.

The Ninth Circuit also upheld the Forest Service's treatment of three other species—the bull charr trout, the wet-sloped cutthroat

trout, and the flammulated owl—even though the Service's analysis of these species "was not as detailed." *Id.* at 760, 761–62. For the bull charr trout, the Forest Service "stated that the trout only marginally used the streams within the decision area, but that the timber sales would not appreciably raise the sediment or carbonate levels in these streams." *Id.* at 760. Moreover, "[t]he Service conducted no analysis at all for the wet-sloped cutthroat trout, presumably because it did not believe that the trout inhabited the decision area." *Id.* at 760 n. 4. Nevertheless, "[t]he Service's failure to engage in a more intensive analysis for the bull charr trout and the wet-sloped cutthroat is understandable, as neither species would be affected by the timber sales." *Id.* at 761–62.

Finally, for the flammulated owl, "the Service noted that the Upper Sunday area contained 366 acres of habitat suitable for nesting and feeding, enough for three potential owl territories; it noted that the timber sales would reduce the size of one of those territories." *Id.* at 760. According to the court, "[t]he Service did not engage in a more extended analysis of the owl's nesting and feeding habitat requirements because such data were unavailable." *Id.* at 762. As a result, the court concluded "that an analysis that uses all the scientific data currently available is a sound one." *Id.*

Plaintiffs also assert that the Forest Service has failed to adequately monitor the bull trout's viability *as provided in the INFISH, PACFISH, and Northwest Forest Plan strategies.* The only time that the Forest Service's regulations require monitoring is when a species has been identified and selected as a management indicator species. 36 C.F.R. § 219.19(a)(6), (1). Bull trout are an indicator species for 21 of the forests at issue.[4] Nevertheless, plaintiffs' pleadings cannot be read as asserting a claim that the Forest Service has violated 36 C.F.R. § 219.19(a)(6); rather, their monitoring arguments are a part of their viability arguments.

---

4. In response to the court's question, the Forest Service has informed me that the bull trout is an indicator species for the Deschutes, Fremont, Gifford Pinchot, Malheur, Mt. Baker–Snoqualmie, Mt. Hood, Ochoco, Okanogan, Olympic, Wallowa–Whitman, Wenatchee, Willamette, Winema, Clearwater, Flathead, Idaho Panhandle, Lolo, Boise, Challis, Humboldt, Payette, and Salmon National Forests.

## 2. The Northwest Forest Plan

Defendant Forest Service argues that the Ninth Circuit has already determined that the Northwest Forest Plan ensures viability for all of the vertebrate populations it covers and thus that defendant is entitled to summary judgment against plaintiffs for all forests plans that the Northwest Forest Plan amended because of claim preclusion, issue preclusion, or the stare decisis effect of the Ninth Circuit's decision. Defendant-intervenor argues that the Forest Service adequately provided for bull trout viability in part through the Northwest Forest Plan. Because the Northwest Forest Plan specifically contemplated the bull trout's viability, I hold that, on the merits and on the basis of stare decisis, it satisfies the NFMA's viability requirement as of the date of the Plan's Final Supplemental Environmental Impact Statement (FSEIS)—February 1994.[5]

The Northwest Forest Plan was adopted largely in response to environmental litigation seeking to preserve the habitat of the northern spotted owl. *Seattle Audubon Soc. v. Moseley*, 80 F.3d 1401, 1403–04 (9th Cir. 1996) (hereinafter *Seattle Audubon II*). In April 1993, President Clinton "established the Forest Ecosystem Management Assessment Team ('FEMAT') to examine options and make recommendations to the Secretaries of Agriculture and Interior in aid of their joint development of a forest management plan to cover federal lands in the Pacific Northwest." *Id.* at 1404. FEMAT reviewed 48 possible strategies, then assessed ten alternatives at length in a single environmental impact statement (EIS) that the Forest Ser-

vice and the Bureau of Land Management jointly prepared to satisfy NEPA's requirements. *Id.* "The Secretaries of Agriculture and Interior adopted Alternative 9 on April 13, 1994." *Id.* Alternative 9 became known as the Northwest Forest Plan.

The cases that defendant relies upon for its argument are *Seattle Audubon Society v. Lyons*, 871 F.Supp. 1291 (W.D.Wash.1994) (hereinafter *Seattle Audubon I* ), and the Ninth Circuit's review in *Seattle Audubon II*, 80 F.3d 1401 (9th Cir.1996). In these cases, twelve environmental groups challenged the adoption of Alternative 9 on various grounds, including the NFMA's viability requirements. None of those groups are parties to this law suit.

With regard to those requirements, the Western District of Washington first upheld the Forest Service's viability regulation. *Seattle Audubon I*, 871 F.Supp. at 1315–16. It then upheld the Secretary of Agriculture's choice of Alternative 9, which "would provide an 80% or better likelihood of providing habitat supporting viable populations of all vertebrate species save three." *Id.* at 1316 (citing the Northwest Forest Plan FSEIS at 3 & 4–174, 179, 184, 188, and 197 and noting that the exceptions were three salamander species "as to which no higher rating was possible because two exist almost exclusively on nonfederal land and the other inhabits only an area of several acres"). The court specifically noted that "[p]laintiffs are correct that the viability regulation requires the agencies to look to species populations—not merely to habitat for hypothetical populations."[6] *Id.*

---

5. Plaintiffs argued at oral argument that although the Northwest Forest Plan was adequate in 1994, new information requires that the Forest Service once more amend the applicable forest plans. In particular, plaintiffs argue that the Reiman & McIntyre studies of bull trout were not part of the Forest Plan record, that the Northwest Forest Plan does not have a temperature standard, and that the Fish and Wildlife Service has now found that two subpopulations of bull trout should be proposed for listing under the Endangered Species Act. First, again I emphasize that I cannot read plaintiffs' briefing as making a formal "new information" claim against the Forest Service. Second, the lack of a temperature standard does not, by itself, render the Northwest Forest Plan inadequate, especially because FEMAT recognized that bull trout re-

quire clear, cold streams. Third, it would be inappropriate at this juncture to censure the Forest Service for not addressing the Fish and Wildlife Service's proposed listing because (1) the proposal has not yet been made and (2) the Forest Service will be entitled to go through its normal consultation and review process after that listing is formalized. Therefore, I do not consider plaintiffs to have made a proper "new information" challenge and do not address it here.

6. The bull trout was not specifically at issue in the *Seattle Audubon* litigation. Therefore, because the Ninth Circuit has subsequently emphasized the importance of viability analyses for individual species in *Inland Empire Public Lands Council v. U.S. Forest Service*, 88 F.3d 754 (9th

On appeal to the Ninth Circuit, the environmental plaintiffs argued "that the federal defendants failed to comply with the viability regulation of the National Forest Management Act because the selected alternative provides for only an 80% likelihood that *listed* species will continue to be viable after implementation of the selected alternative, and the resulting 20% likelihood of extinction is impermissible under the regulation." *Seattle Audubon II*, 80 F.3d at 1404 (emphasis added). In the context of the district court's opinion and the Ninth Circuit's discussion, "listed" most logically refers to the more than a thousand animal and plant species that FEMAT analyzed in the EIS. *Seattle Audubon II*, 80 F.3d at 1404; *Seattle Audubon I*, 871 F.Supp. at 1303.

In their Record of Decision adopting Alternative 9 as amendments to planning documents, including forest plans, the Forest Service and Bureau of Land Management expressly discussed species viability requirements under the NFMA. RECORD OF DECISION FOR AMENDMENTS TO FOREST SERVICE AND BUREAU OF LAND MANAGEMENT PLANNING DOCUMENTS WITHIN THE RANGE OF THE NORTHERN SPOTTED OWL 43–47 (April 13, 1994) (hereinafter Northwest Forest Plan ROD). Noting that the Forest Service's viability regulation "was used as a criterion in the development of the alternative we select today," *id.* at 44, the agencies found "that this decision satisfies the requirements of the statute and its implementing regulations because it will provide an amount and distribution of habitat adequate to support the continued persistence of vertebrate species in the planning area." *Id.* at 45. The agencies also indicated that they relied for this conclusion upon the Northwest Forest Plan's Final Supplemental EIS (FSEIS). *Id.* at 45–46.

As that FSEIS elaborates, several fish species were originally presented to FEMAT for evaluation. FINAL SUPPLEMENTAL ENVIRONMENTAL IMPACT STATEMENT OF MANAGEMENT OF LATE-SUCCESSIONAL AND OLD-GROWTH FOREST RELATED SPECIES WITHIN THE RANGE OF THE NORTHERN SPOTTED OWL, Vol. 1, 3 & 4–192 (Feb.1994) (hereinafter Northwest Forest Plan FSEIS). Of these species, FEMAT chose to assess seven species—including the bull trout—leaving out the rest because either insufficient information was available on the species' ecology or because the species had only limited distribution on federal lands. *Id.* at 3 & 4–192–93. FEMAT "considered the likelihood of attaining a set of outcomes for habitat of the seven races/species/groups of fish on federal lands for each alternative," and it "compared alternatives by assessing the likelihood of each alternative to achieve habitat of sufficient quality, distribution, and abundance to allow the species population to stabilize, well distributed across federal lands." *Id.* at 3 & 4–192.

FEMAT also selected all seven species of fish for additional assessment. *Id.* at 3 & 4–196. The bull trout, alone of the seven, "was selected for addition analysis based on the potential for cumulative effects." *Id.* Thus, FEMAT explicitly made the cumulative effects of Forest Service activities and habitat degradation a part of its viability determination for bull trout.

Under Alternative 9, FEMAT assessed the bull trout to have an 85% likelihood of being well distributed, leaving a 15% likelihood of being locally restricted. These were the best statistics for any of the seven assessed fish species under that alternative, and nearly the best statistics the bull trout could have had under any of the ten alternatives that FEMAT compared.[7] Northwest Forest Plan FSEIS at 3 & 4–197, Table 3 & 4–34. The likelihood of bull trout being restricted to refugia and its risk of extirpation were both assessed as "0." *Id.*

In addition, FEMAT determined, from available distribution maps, that "the vast majority of, if not all, bull trout habitat on federal land within the range of the northern spotted owl occurred within Tier 1 Key Wa-

---

Cir.1996), I am unwilling to decide the sufficiency of the Forest Service's viability analysis of bull trout on the basis of claim or issue preclusion.

7. Under Alternative 1, the bull trout was assessed as having a 90% likelihood of becoming well distributed, with only a 10% chance of being locally restricted. Northwest Forest Plan FSEIS at 3 & 4–197, Table 3 & 4–34.

tersheds," *id.* at 3 & 4–199, which provide the best habitat. Moreover:

> The high level of protection provided by Riparian Reserve Scenario 1, the high proportion of other reserves within Key Watersheds, and the standards and guidelines specific to Key Watersheds resulted in a highlevel of protection for bull trout habitat. The additional standards and guidelines added to Alternative 9 * * * would reduce the risk of cumulative effects from management-induced disturbances in areas outside the Tier 1 Key Watersheds where bull trout occur. The standards and guidelines would result in at least an 85 percent likelihood of attaining sufficient aquatic habitat to support well-distributed populations for bull trout.

*Id.*

In performing its assessment for the bull trout, FEMAT noted that the bull trout was a candidate for listing under the Endangered Species Act. FOREST ECOSYSTEM MANAGEMENT: AN ECOLOGICAL, ECONOMIC, AND SOCIAL ASSESSMENT (July 1993) V–11 (hereinafter FEMAT Assessment). Moreover, in assessing each alternative for its effects on the seven fish species, FEMAT "considered five factors: (1) assessments for the individual races/species/groups made by the expert panel * * *; (2) amount of Riparian Reserves and type and level of land-management activity allowed within them; (3) extent of other reserves * * * and type and level of land management allowed within them; (4) presence of a watershed restoration program * * *; and (5) prescriptions for management of Matrix lands." *Id.* at V–64. Of these five factors, moreover, FEMAT weighted the first three most heavily. *Id.*

█ The record thus demonstrates that FEMAT and the Forest Service thoroughly considered bull trout viability when adopting the Northwest Forest Plan and that the Forest Service implemented amendments expected to give the bull trout habitat more than sufficient, under the *Seattle Audubon II* standard, to ensure viability. Therefore, under *Inland Empire Public Lands Council*

and the *Seattle Audubon* decisions, defendant and defendant-intervenors are entitled to summary judgment to the extent that the Forest Service adequately ensured bull trout viability in its adoption of the Northwest Forest Plan, as applied through forest plan amendments to the included watersheds.[8]

### 3. *INFISH*

The Inland Native Fish Strategy (INFISH) "is intended to provide interim direction to protect habitat and populations of resident native fish outside of anadromous fish habitat in eastern Oregon, eastern Washington, Idaho, western Montana, and portions of Nevada." DECISION NOTICE AND FINDING OF NO SIGNIFICANT IMPACT FOR THE INLAND NATIVE FISH STRATEGY, Abstract (1995) (hereinafter INFISH FONSI). In its decision adopting INFISH, the Forest Service specifically noted that INFISH does not apply to areas addressed in the Northwest Forest Plan or in PACFISH. *Id.*

With regard to fish, the "[i]nland native fish species within the scope of this decision have been identified by state, private, and federal agencies as being at risk primarily to habitat degradation, introduction of exotic species, over-fishing, and loss of migratory forms." *Id.* Moreover, the Forest Service noted that:

> The selected alternative will provide for a network of priority watersheds within the geographic area. These priority watersheds were designated where watersheds have excellent habitat or strong assemblages on inland native fish, *particularly bull trout*, or watersheds that provide for population distribution goals, or where watersheds have a high restoration potential. Within the priority watersheds, ongoing projects have to be screened to determine their potential habitat effects and whether they will need to be modified to reduce risk to inland native fish habitat. Watershed analysis would also be required for some management activities within the riparian

---

**8.** According to plaintiffs, the forest plans so amended include those for the Mount Baker–Snoqualmie, Gifford Pinchot, Okanogan, Olympic, Wenatchee, Siskiyou, Siuslaw, Umpqua, Rogue River, Winema, Willamette, Mount Hood, and Deschutes National Forests in Region 6.

habitat conservation areas in priority watersheds.

INFISH FONSI at 1 (emphasis added). Thus, bull trout are explicitly part of INFISH's considerations.

In addition, as part of INFISH, the Forest Service and BLM instituted a screening process for bull trout in conjunction with the U.S. Fish and Wildlife Service. INFISH FONSI at 3. All proposed and new projects and all ongoing projects and activities "were rated as either having a high, moderate, or low risk, or no effect on bull trout populations or habitat." *Id.* Moreover, all proposed and new projects were subject to INFISH's new strategies.

However, for existing projects, the Forest Service engaged in extensive screening in the administrative record indicates that extensive screening in "selected high priority watersheds," INFISH A.R. Vols. 13–18, "to gauge the effectiveness of ongoing Federal actions in maintaining the quality and quantity of bull trout habitat * * *." FOREST PLAN BULL TROUT HABITAT EFFECTIVENESS MONITORING STRATEGY, INLAND NATIVE FIVE STRATEGY ENVIRONMENTAL ASSESSMENT, App. I–3. Therefore, the screening program is not, itself, a viability analysis; instead, it is more of a monitoring program.

Nor can the identification of priority watersheds themselves be considered a viability analysis. As part of the decisionmaking process for INFISH, the Forest Service had the Forest Supervisors in Regions 1, 4, and 6 identify and map priority watersheds for the bull trout. INFISH A.R. Vol. 11, Doc. 570–1 (March 15, 1995). Priority watersheds are "system[s] of drainage basins or sub-basins which each encompass an important regional or meta population of inland or resident fish species. *These drainages are critical to the long-term persistence of a species throughout its range,* and vary in size from 250 to 2500 square kilometers." *Id.* at 570–2. In addition, the Forest Service identified five criteria for core watersheds:

— Core watersheds should be selected to provide all critical habitat elements.

— Core watersheds should be selected from the best available habitats or from the habitat with the best opportunity to be restored to high quality.

— Core watersheds should provide the potential for replication of strong subpopulations within its boundaries.

— Core watersheds should be large enough to incorporate genetic and phenotypic diversity, but small enough to ensure that the component populations effectively connect.

— Core watersheds should be distributed throughout the historic range of the species.

*Id.* at 570–2.

Nevertheless, while the exercise of identifying priority and core watersheds ensured that the bull trout's most critical habitat would be identified and protected, the court could find nothing in the administrative record that specifically explained why the Forest Service deemed that its focus on priority watersheds—and only certain of those— would be sufficient to ensure overall bull trout viability in spite on ongoing projects.

Nevertheless, the court recognizes that awareness of the bull trout's status permeates the INFISH administrative record. As early as August 1993, Forest Supervisors and Directors were required to ensure that the Biological Evaluations for each project or activity that might affect the bull trout or its habitat were valid. INFISH A.R. Vol. 12, Doc. 578 (August 1993). On February 23, 1995, the Forest Service held a "Bull Trout Meeting" in which it determined that it should "[i]dentify core watersheds and focal habitats throughout the range of the bull trout," regarding this information as "essential" for INFISH and the screening program. INFISH A.R. Vol. 6, Doc. 241–2. The Forest Service evaluated watersheds by acres available, their priority, and the status of bull trout within them. INFISH A.R. Vol. 11, Doc. 506 (May 19, 1995). It adopted the scientific principles used to assess salmonids for PACFISH, INFISH A.R. Vol. 11, Doc. 512 (May 15, 1995); reviewed the scientific literature regarding historical trends in bull trout abundance, INFISH A.R. Vol. 11, Doc. 513 (May 10, 1995); and identified the historic and the current range of the bull trout and depressed and strong populations. INFISH

A.R. Vol. 11, Doc. 557B (April 3, 1995). The Forest Service rejected alternatives that would apply stricter standards and guidelines only "to known areas with habitat occupied by species listed as candidates for ESA listing and by Forest Service Sensitive species" because "the occupied habitat is not known for every species"; instead, the alternative it selected as the INFISH strategy applies standards and guidelines consistently through all covered forests, adjusted only through watershed analysis. INFISH A.R. Vol. 11, Doc. 559 (March 30, 1995). The Forest Service also tabulated the acreage of priority watersheds by National Forest, IN-FISH A.R. Vol. 12, Doc. 592 (June 1995), and provided justifications for choosing the watersheds it chose based on bull trout uses. INFISH A.R. Vol. 12, Doc. 595 (April 1995).

In the final Environmental Assessment for INFISH, the Forest Service relied on six pages of authorities, including both the 1993 and 1995 Reiman & McIntyre studies of bull trout.[9] INFISH Environmental Assessment at C–5. In addition, the Forest Service has continued to perform viability studies of the bull trout. INFISH A.R. Vol. 26, Doc. 719.

What is missing in INFISH is a clearly articulated application of this knowledge—or, as the case may be, lack of knowledge [10]—to the decisions the Forest Service made. Nevertheless, the administrative record contains enough of an explanation to pass muster under the principles of *Inland Empire.* First, the Ninth Circuit has rejected the argument "that the Service must assess population viability in terms of actual population size, population trends, or the population dynamics of other species." *Inland Empire Public Lands Council,* 88 F.3d at 761 n. 8. Moreover, in *Inland Empire* the court upheld the Forest Service's viability analyses when it could find both an analysis of what the alternative selected would do to the species at issue and an explanation—however brief—of why that level of analysis was sufficient. *Id.* at 761–62.

Here, the Forest Service stated that IN-FISH will "greatly reduc[e] risk of loss of populations and potential negative effects to aquatic habitats during the interim period," INFISH FONSI at 2, and that within the priority watersheds unacceptable risks would be eliminated. *Id.* Although the Forest Service did not clearly articulate why it felt that the focus on priority watersheds was a reasonable means of ensuring viability for the species as a whole, it did explain that, for all the alternatives it considered:

> Anticipated effects on native resident fish and the aquatic habitat that supports them traditionally have been estimated by the effects on representative habitats and species. By ensuring that such representative habitats and species are adequately considered, sufficient habitat quality and diversity are presumed to exist where all species using similar habitats are protected and/or restored. Adoption of alternatives presented here would serve, by varying degrees, to preserve or restore existing riparian and aquatic habitats and related aquatic resources, with special emphasis on native fish habitat.

INFISH Environmental Assessment at III–13. Moreover, for Alternative D, the alternative it adopted as the INFISH strategy, the Forest Service commented:

> Under Alternative D, additional protection of riparian and fish habitat would immediately occur, because Alternative D would broaden the application of management direction by including new standards and guidelines to all proposed projects and activities and some ongoing projects and activities within RHCAs, and to projects and activities that are outside RHCAs but are likely to impact RHCAs.

> Although there would be no permanent cessation of activities in RHCAs, some actions would be modified or deferred during the interim period, therefore some adverse effect on riparian and aquatic habitats within RHCAs would be reduced. *Be-*

---

9. I emphasize these two studies in particular because plaintiffs rely heavily upon them to argue that the Forest Service has not ensured bull trout viability.

10. As plaintiffs themselves admit, "Reiman and McIntyre clearly state that not enough information is known about bull trout to firmly establish minimum population size for long term viability * * *."

*cause the restoration of riparian and aquatic habitat complexity typically occurs over a much longer time than is considered in this environmental assessment, benefits during the interim period would be expected to be minimal.* Case-by-case reviews would be made of ongoing actions in "Priority" watersheds, and those actions determined to pose a risk identified and addressed, so some benefits to native resident fish and bull trout habitat and populations in particular could be expected.

*Id.* at III–15 (emphasis added).

The Ninth Circuit in *Inland Empire* upheld less thorough viability analyses when the nature of the Forest Service's decision precluded its having much effect on certain specific species. *Inland Empire Public Lands Council,* 88 F.3d at 761–762. Here, the Forest Service intended INFISH to be a short-term, interim strategy, and it is currently working on a more permanent, long-term strategy, the Interior Columbia Basin Ecosystem Management Project (ICBEMP). *See* 61 Fed.Reg. 47859 (Sept. 11, 1996); 62 Fed.Reg. 2176 (Jan. 15, 1997). Moreover, in adopting INFISH, the Forest Service consulted viability studies, identified high priority watersheds for bull trout on the basis of promoting diversity and viability, and screened forest projects and activities within those watersheds to reduce their impact on bull trout.

■ On the basis of this record and *Inland Empire,* I cannot say that the Forest Service acted arbitrarily and capriciously in adopting INFISH with regard to providing for bull trout viability. Defendant and defendant-intervenor are thus entitled to summary judgment as to plaintiff's viability argument for the watersheds that INFISH covers.[11]

Nevertheless, INFISH meets the NFMA's viability requirements largely because it is an interim strategy. Although INFISH's duration has always been tied to the Forest Service completing its larger plan, I note that

the Forest Service originally expected IN-FISH to last 18 months and now expects that it will last three years. At some point, if the Forest Service does not adopt the ICBEMP on its current schedule, INFISH will be inadequate as a long-term fulfillment of the Forest Service's viability responsibilities to the bull trout. In addition, I suggest that the Forest Service may want to more fully articulate its viability analyses for sensitive, threatened, and endangered species when it adopts the ICBEMP.

**4. PACFISH**

The Interim Strategies for Managing Anadromous Fish–Producing Watersheds in Eastern Oregon and Washington, Idaho, and Portions of California, commonly known as PACFISH, include "a range of interim management strategies designed to arrest the degradation and begin the restoration of habitat for Pacific salmon, steelhead, and sea-run cutthroat trout (anadromous fish)." Decision Notice/Decision Record, Finding of No Significant Impact, Environmental Assessment for the Interim Strategies for Managing Anadromous Fish–Producing Watersheds in Eastern Oregon and Washington, Idaho, and Portions of California, Reader Introduction (Feb. 24, 1995) (hereinafter PACFISH FONSI). The Forest Service's decision repeatedly emphasizes "anadromous fish" and "salmon, steelhead, and sea-run cutthroat trout," but I was unable to find a single reference to bull trout in the PACFISH FONSI.

The PACFISH Environmental Assessment also focuses almost exclusively on anadromous fish, which it explicitly defines as "naturally reproducing Pacific salmon, steelhead, and sea-run cutthroat trout." PACFISH Environmental Assessment, at 1 (Feb.1995). Thus, even though bull trout have an anadromous form, the Environmental Assessment, by its own terms, does not address it.

Bull trout, however, *are* present in the areas PACFISH affects. *Id.* at 52. Never-

---

11. According to plaintiffs, the forest plans that INFISH amended include those for the Okanogan, Winema, Deschutes, Malheur, Ochoco, Wallowa–Whitman, Fremont, and Colville National Forests in Region 6; the Boise, Challis, Saw-

tooth, Humboldt, Payette, and Caribou National Forests in Region 4; and the Bitterroot, Clearwater, Deerlodge, Flathead, Helena, Idaho Panhandle, Kootenai, and Lolo National Forests in Region 1.

theless, the Forest Service expressly eliminated "[t]he option of applying interim direction to watersheds beyond the. range of anadromous fish but where there is habitat important to at-risk resident fish species—such as the bull trout" "because it is beyond the scope of this environmental assessment, and because independent initiatives to address resident fish habitat management already have begun." PACFISH Environmental Assessment at 25–26 (citing the bull trout Habitat Conservation Assessment and various interagency planning meetings). Similarly, it expressly eliminated a management option that was identical to Alternative 9 in the Northwest Forest Plan. *Id.*

While the Forest Service has discretion to define the scope of its decisions, in PACFISH there is no indication that the Forest Service considered bull trout either to be a representative species or to be adequately represented by the anadromous species when it analyzed the environmental consequences to the fishery resource, *id.* at 52–55. Instead, the recognition that bull trout habitat extended beyond that considered in PACFISH, as noted above, indicates that the focus on anadromous fish was in fact inadequate. Nor, as defendant-intervenors argued in oral argument, could the Forest Service reasonably delay considering bull trout viability until it adopted INFISH, given the fact that INFISH and PACFISH are mutually exclusive in the watersheds they cover.

Other factors also indicate that the Forest Service did not adequately analyze bull trout viability when it adopted PACFISH. First, none of the five issues it addressed in formulating and evaluating the PACFISH alternatives address the viability of non-anadromous or sensitive species. PACFISH Environmental Assessment at 21–22. Second, although the U.S. Fish and Wildlife Service concurred in the alternative selected, it did so only for listed species. *Id.* at 56. Because the bull trout was not yet listed, it was not included in this concurrence.[12] Third, in its analysis of sensitive species, the Forest Service did not mention bull trout, *id.*, nor could I find nor the Forest Service counsel

identify anything in the administrative record that showed that bull trout were part of this sensitive species analysis. Fourth, the scientific literature that the Forest Service relied on did not include either of the Reiman & McIntyre studies on bull trout or any other studies whose titles indicate a specific focus on bull trout. *Id.* App. A.

Fifth, in response to public comments that the scope of the interim direction should be expanded to include bull trout, the Forest Service simply responded that the interim direction will also benefit resident fish and repeated its reasons for eliminating a larger geographical scope. PACFISH Environmental Assessment, App. F–12. Sixth, a Biological Evaluation in February 1994—which the Forest Service included as part of its final decision—concluded that "impacts to sensitive species could occur, to some extent, with the implementation of the alternative," *id.* at App. G–3, and that the alternative chosen, Alternative 4, was median in its risks to sensitive species. *Id.* Seventh, because the bull trout was not yet considered a species proposed for listing under the Endangered Species Act, it was not addressed in PACFISH's Biological Assessment, written in February 1994. *Id.* App. H. That assessment appears to be the only one performed to support PACFISH's adoption.

In adopting PACFISH, therefore, the Forest Service admitted that bull trout were included within the area to which PACFISH would apply but included no analysis of why PACFISH would ensure the viability of bull trout, even though the Biological Evaluation included as part of the decision commented that the alternatives could affect sensitive species and that the alternative chosen was not the least risky in this regard. While I acknowledge that improving watersheds for anadromous fish *could* simultaneously improve bull trout habitat, I am also aware that (1) FEMAT, for the Northwest Forest Plan, repeatedly distinguished bull trout from the six other fish that it assessed, all of which are anadromous fish in PACFISH's meaning

---

12.  In contrast, the administrative record reveals that in adopting INFISH the Forest Service was

continually aware that the bull trout might be listed under the Endangered Species Act.

of the word;[13] (2) bull trout showed a different viability response than these six anadromous fish; and (3) FEMAT chose to submit bull trout to additional assessment for a completely different reason than for the six anadromous fish. FSEIS at 3 & 4–196–97. Moreover, the reason FEMAT gave for bull trout, which set it apart from the anadromous fish studies, was the "potential for cumulative impacts." *Id.* at 3 & 4–196.

In light of these distinctions, I cannot assume in the face of a complete absence of viability analysis by the Forest Service that PACFISH's protections for anadromous fish adequately ensure the bull trout's viability. An agency action is arbitrary and capricious if the agency fails to "articulate a satisfactory explanation for its action," *Motor Vehicle Mfrs. Ass'n.*, 463 U.S. at 43, 103 S.Ct. at 2866 (citations omitted), or fails to "set forth clearly the grounds on which it acted." *Atchison T. & S.F. Ry. v. Wichita Bd. Of Trade*, 412 U.S. 800, 807, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350 (1973). I therefore find that the Forest Service was arbitrary and capricious and in violation of its own regulation when it adopted PACFISH and that plaintiffs are entitled to summary judgment for the forest plans that PACFISH, and PACFISH alone, amends.[14]

## CONCLUSION

The Forest Service was arbitrary and capricious and in violation of the NFMA and its implementing regulations when it adopted PACFISH because it did not adequately address the viability of the bull trout within the National Forests whose forest plans PACFISH amended. As a result, plaintiff is entitled to summary judgment (# 177–1) on this issue, and the Forest Service remains in violation of its duty to ensure bull trout viability for those watersheds governed by PACFISH. Moreover, in response to plaintiff's motion to bifurcate (# 177–2), a hearing to establish the appropriate relief will be held within 45 days of the effective date of this opinion. Because PACFISH does provide needed protection to threatened and endangered anadromous fish, however, it shall remain in effect until the I have determined what the appropriate relief would be and the Forest Service implements that relief.

The Forest Service and defendant-intervenor are entitled to summary judgment (# 190, # 197) regarding the Northwest Forest Plan and INFISH. However, as I have already discussed, it is clear that INFISH is not a permanent strategy, nor should the Forest Service assume that it can rely on INFISH as if it *were* a permanent strategy. Moreover, I expect and assume that when the two populations of bull trout are proposed for listing under the Endangered Species Act, the Forest Service will review the Northwest Forest Plan to determine if it requires further amendment and will incorporate the proposed listings into its planning process and analysis for the ICBEMP.

IT IS SO ORDERED.

---

**13.** The six other species were coho salmon, fall chinook salmon, spring chinook salmon/summer steelhead trout, winter steelhead trout, sea-run cutthroat trout, and resident rainbow/cutthroat trout.

**14.** PACFISH governs watersheds in the Bitterroot, Clearwater, Nez Perce, Boise, Challis, Payette, Salmon, Sawtooth, Malheur, Ochoco, Okanogan, Umatilla, and Wallowa–Whitman National Forests.