SODA MOUNTAIN WILDERNESS COUNCIL; Oregon Wild; Klamath Siskiyou Wildlands Center; Center for Biological Diversity; and Cascadia Wildlands Project, Plaintiffs,

v.

UNITED STATES BUREAU OF LAND MANAGEMENT, Defendant.

No. 1:12–CV–434–CL.

United States District Court, D. Oregon, Medford Division.

May 10, 2013.

Marianne G. Dugan, Sean T. Malone, Attorney at Law, Eugene, OR, for Plaintiffs.

Alison D. Garner, U.S. Department of Justice, ENRD Natural Resources Section Ben Franklin Station, Washington, DC, for Defendant.

## ORDER

PANNER, District Judge.

Plaintiffs claim that the U.S. Bureau of Land Management (BLM) violated the National Environmental Policy Act (NEPA) and the Federal Land and Policy Management Act (FLPMA) by approving the Sampson Grove Forest Management Project, a timber sale that would allow commercial logging on 500 acres of BLM land near Ashland, Oregon.

The parties filed cross-motions for summary judgment. Magistrate Judge Mark D. Clarke has issued a Report and Recommendation (R & R), recommending that defendant's motion be granted except as to plaintiffs' claim that defendant's Environmental Assessment (EA) violated NEPA by failing to consider the cumulative impacts of the Cottonwood Forest Management Project. The R & R recommends granting plaintiffs' motion for summary judgment on this claim only.

The matter is now before this court. *See* 28 U.S.C. § 636(b)(1)(B), Fed.R.Civ.P. 72(b). The parties object to the R & R, so I have reviewed this matter de novo. 28 U.S.C. § 636(b)(1)(C); *McDonnell Douglas Corp. v. Commodore Bus. Mach., Inc.,* 656 F.2d 1309, 1313 (9th Cir.1981). I adopt the thorough and well-reasoned R & R except as to the cumulative impacts claim.

## DISCUSSION

Plaintiffs claim that the Sampson Cove EA did not adequately consider the cumulative impacts of the Cottonwood pro-

ject. "An EA must fully assess the cumulative impacts of a project." *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1141 (9th Cir.2011). Cumulative impact is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and *reasonably foreseeable future actions* regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7 (emphasis added). Courts "defer to an agency's determination of the scope of its cumulative effects review." *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1071 (9th Cir.2002).

When defendant published the Sampson Cove EA in July 2010, it had not yet identified the timber harvest units or the types of treatments to be used for the Cottonwood project. Defendant did not send a "scoping" letter for the Cottonwood project until late October 2010.

 Because the Cottonwood project was still in preliminary planning stages when defendant published the Sampson Cove EA, defendant did not violate NEPA by failing to consider possible cumulative impacts of the Cottonwood project. The government is not required to consider the cumulative impacts of a project "if not enough information is available to permit meaningful consideration." *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1014 (9th Cir.2006) (*EPIC*). In *EPIC*, the court held that the Forest Service did not violate NEPA when it failed to consider the cumulative impacts of a timber sale that was " 'in the initial planning stage' and 'specifics of the units (size and treatment prescription)' had not been identified at that time." *Id.* (quoting EA at issue). The same reasoning applies here.

I conclude that defendant's motion for summary judgment should be granted in its entirety. I adopt the R & R in all other respects.

### CONCLUSION

The Report and Recommendation (# 40) is adopted except as to plaintiffs' cumulative impacts claim. Plaintiffs' motion for summary judgment (# 17) is denied. Defendant's motion for summary judgment (# 23) is granted.

IT IS SO ORDERED.

### REPORT & RECOMMENDATION

CLARKE, United States Magistrate Judge.

In August 2010, defendant Bureau of Land Management ("BLM") approved the Sampson Cove Forest Management Project ("the Project"), a timber sale that would allow 504 acres of commercial logging, pre-commercial thinning of 85 acres, and 500 feet of road construction on BLM lands near Ashland, Oregon. Plaintiffs, environmental groups Soda Mountain Wilderness Council, Oregon Wild, Klamath Siskiyou Wildlands Center, Center for Biological Diversity, and Cascadia Wildlands Project (collectively "plaintiffs"), bring this action under the Administrative Procedure Act ("APA") to challenge the BLM's decision. Plaintiffs allege that the BLM's approval of the Project violates the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* and the Federal Land Policy Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.* This court has jurisdiction pursuant to 28 U.S.C. § 1331. Presently before the court are plaintiffs' motion for summary judgment and the BLM's cross-motion for summary judgment and motion to strike extra-record documents. Oral argument occurred on September 13, 2012. For the reasons stated below, the court grants in part and denies in part the BLM's motion to strike

(# 31), and recommends that plaintiffs' motion for summary judgment (# 17) be granted in part and denied in part, and recommends that the BLM's cross-motion for summary judgment (# 23) be granted in part and denied in part.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Project Area.

The Sampson Cove Forest Management Project entails commercial logging of 455 acres[1], pre-commercial thinning of 85 acres, and 500 feet of new road construction scattered primarily across the Upper Bear Creek Watershed Analysis Area, a 110–square mile area in the southern Cascade range in southwestern Oregon. AR 4688, 10249.[2] The BLM manages roughly 23% of the analysis area, the Bureau of Land Reclamation manages 2%, and the remainder belongs to private owners. AR 10249. The Project would occur on 28 separate harvest "units" on the BLM-managed land in the analysis area.[3]

The analysis area for the Project is the upper portion of the Bear Creek Watershed, with the southern and eastern rides of the analysis area forming the divide between the Rogue and Klamath River Basins. AR 10249. The analysis area is home to portions of the Pacific Crest National Scenic Trail, Soda Mountain, and a variety of animals, including owls, eagles, bats, deer, and fish. AR 10249, 10291, 10250. Within recent years, greater forest stand density and a rise in bark beetle attacks and pathogens on forest stands have caused an increase in fire hazard within the analysis area. AR 10251. The Cascade–Siskiyou National Monument, established by presidential proclamation in 2000 as the first monument dedicated for biodiversity preservation, lies to the southeast of the analysis area.[4]

The land managed by BLM in the Project area is designated by the Northwest Forest Plan ("NWFP") as "matrix" land.[5] AR 4690. Matrix land is land designated as "unreserved areas ... in which timber harvest may go forward subject to environmental requirements." *Seattle Audubon Soc'y v. Lyons*, 871 F.Supp. 1291, 1305 (W.D.Wa.1994), *aff'd sub nom.*, *Seattle Audubon Soc'y v. Moseley*, 80 F.3d 1401 (9th Cir.1996). Portions of the Project area land are additionally governed by provisions of the Oregon and California Act ("O & C Act"), which provide that the primary use of O & C lands is timber production, to

---

**1.** The Project currently entails 455 acres of logging over 28 harvest units. The August Decision Record ("DR.") approved 504 acres of commercial logging on 33 harvest units. However, in May 2012, the BLM and the Project's high bidder, Boise Cascade Wood Products, signed a contract modification removing five "Disease Management" units, totaling 49 acres, from the sale. AR a-d.

**2.** The administrative record ("AR") is a compilation of documents the BLM relied upon to make its decision and sets forth the material facts in this case.

**3.** The Project was originally planned over 33 harvest units, but a contract modification removed five "Disease Management" units. *See* Note 1, *supra*.

**4.** President Bill Clinton established the Cascade–Siskiyou National Monument by proclamation on June 9, 2000. Proclamation No. 7318, 65 Fed.Reg. 37249 (June 9, 2000).

**5.** The NWFP is a series of federal policies drafted to protect northern spotted owl habitats over 24.5 million acres in the Pacific Northwest, while also providing recreational opportunities and sustainable timber supply. AR 21561–23240. The NWFP allocates land into six different categories according to their use. Land outside of the six categories is "matrix," and is to be used primarily for timber harvest. AR 21591.

be managed in conformity with sustained yield principles. *Headwaters, Inc. · v. BLM,* 914 F.2d 1174, 1183 (9th Cir.1990). All of the BLM-managed land in the area is part of the 859,100–acre Medford BLM district. AR 20065.

## II. The Project.

The BLM proposed the Project "to provide for long-term forest (timber) production in the Sampson Cove Project Area while providing for the maintenance of existing northern spotted owl habitat." AR 4689. Specifically, the BLM intended that the Project (1) ensure sustainable forest production by reducing the risk of stand loss from fires, insects and disease; (2) provide forest products; (3) maintain stand structure for spotted owl habitat; and (4) maintain a transportation system within the Project area. AR 4689–4690.

The Project implements the Medford District Land Resource Management Plan ("RMP"), which provides objectives and guidelines for implementing forest management projects in the Medford BLM district. AR 20065. Because the Medford district is within the range of the northern spotted owl, the RMP incorporates the NWFP.

## III. Procedural History.

On March 25, 2010, the BLM issued a notice asking for preliminary "scoping" comments about the Project. AR 5986–59693. The BLM issued an Environmental Assessment ("EA") for the Project on July 9, 2010, and announced a 30–day public comment period. AR 4680–4681. The EA discussed the impact of the Project on various issues, including soil compaction, increased sediment, northern spotted owl habitat, and timber diversity. The EA considered one no-action alternative to the

Project. AR 4697. Plaintiffs and other concerned parties submitted timely comments.

In August 2010, the BLM issued a Decision Record ("DR") and Finding of No Significant Impact ("FONSI") for the project, adopting the proposed action alternative and concluding that preparation of an Environmental Impact Statement ("EIS") was not necessary. AR 4042–4048. On August 19, 2010, BLM published a Notice of Sale for the Project. AR 3810. The BLM declared Boise Cascade Wood Products to be the highest bidder on December 3, 2010. AR a. On January 23, 2012, plaintiffs appealed the approval of the project to the Interior Board of Land Appeals ("IBLA") and requested a stay of the decision. AR 191–226. In March 2012, the automatic stay expired. IBLA declined to issue a further stay.

Plaintiffs filed a complaint in this court on March 9, 2012, protesting the Project's commercial logging and road construction (# 1).[6] On May 8, 2012, Boise Cascade Wood Products and the BLM signed a contract modification removing five disease management units from the Project, reserving additional green trees in one unit of the Project, and requiring felling of trees on an additional unit in the Project. AR b. Plaintiffs filed a motion for summary judgment on June 25, 2012(# 17). The BLM filed a cross-motion for summary judgment on July 16, 2012(# 23).

## OVERVIEW OF ARGUMENTS

Plaintiffs allege that the BLM (1) violated NEPA by inadequately addressing the likely environmental impacts of the Project, including the potential for portions of the Project area to be designated as wilderness and/or included in the Cascade–Siskiyou National Monument, and the Pro-

---

6. Plaintiffs do not challenge the pre-commercial thinning portion of the Project.

ject's potential impact on sensitive bat species; (2) violated NEPA by failing to address the cumulative impacts of the Project in combination with other nearby planned timber sales; (3) violated NEPA by failing to prepare an EIS for the Project; (4) violated FLPMA and NEPA by ignoring standards and guidelines for retention of coarse woody material; and (5) violated FLPMA and NEPA by failing to comply with the Medford District RMP's guidelines on green tree retention. The BLM contends that it properly analyzed the Project's environmental consequences and complied with all applicable laws and regulations.

### EXTRA–RECORD MATERIALS

■ Before reaching the merits of the case, the court must first determine what evidence it can consider. Judicial review of agency decisions is generally limited to the administrative record the agency relied on making its decision. *Animal Def. Council v. Hodel,* 840 F.2d 1432, 1436 (9th Cir.1988), *amended,* 867 F.2d 1244 (9th Cir.1989). With their reply brief in support of their motion for summary judgment (# 30), plaintiffs submitted five exhibits that are not part of the administrative record. The BLM seeks an order striking these exhibits (# 31).

■ The Ninth Circuit recognizes four exceptions where extra-record materials should be allowed: (1) if necessary to determine whether the agency considered all relevant factors and explained its decision; (2) when the agency relied on extra-record documents; (3) where supplementation is needed to explain or clarify technical matters involved in an agency action; and (4) where plaintiffs make a showing of agency bad faith. *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,* 450 F.3d 930, 943 (9th Cir.2006). The burden to prove that the extra-record documents

fit within one of these exceptions falls on the plaintiff. *Animal Def. Council* at 1437. Plaintiffs argue that the five exhibits fall within these exceptions.

### A. Exhibit D.

■ As Exhibit D to their reply in support of their motion for summary judgment, plaintiffs offer a May 26, 2010 letter from former Secretary of the Interior Bruce Babbitt to a representative of plaintiff Soda Mountain Wilderness Council. The letter states in part that "[the Department of Interior under Secretary Babbitt] should have been more expansive in [its] thinking about monument boundaries" and that the Monument "should now be expanded." Plaintiffs contend that Exhibit D should be admitted because the letter shows that the BLM did not consider all relevant factors in its decision. Plaintiffs argue that Exhibit D shows that there is a movement to expand the Monument, and that the BLM should have considered the Project's impact on the expansion of the Monument in its Project EA.

■ The Ninth Circuit recognizes an exception for information "necessary to determine whether the agency considered all relevant factors and explained its decision." *Ctr. for Biological Diversity,* 450 F.3d at 943. Consideration of evidence not in the record may be necessary to prove that an agency has not considered all relevant factors. *Asarco, Inc. v. EPA,* 616 F.2d 1153, 1160 (9th Cir.1980).

The court grants the BLM's motion to strike Exhibit D. While Exhibit D does show that Bruce Babbitt supports expansion of the Monument, the letter does not state where the Monument should be expanded, nor does it constitute a proposal for Monument expansion or an official government statement. Admission of the letter would not contradict the BLM's assertion that the Project area has not been

formally considered for inclusion in the Monument. Because admission of the letter would not help determine whether the BLM considered all relevant factors in making its decision on the Project, the BLM's motion to strike Exhibit D is granted.

## B. Exhibit E.

■ As Exhibit E, plaintiffs offer a letter dated September 27, 2011 from Oregon Governor John Kitzhaber to the BLM Oregon State Office Director and the Secretary of the Interior, stating that that there is support from various scientists for expansion of the Cascade–Siskiyou National Monument. Plaintiffs argue that admission of Exhibit E is appropriate because it demonstrates that the BLM did not consider all relevant factors in its decision. As with Exhibit D, plaintiffs contend that Exhibit E shows that the expansion of the Monument has long had support among scientific and other communities, contradicting the BLM's assertion that the Project area has not been considered for future inclusion in the Monument and thus does not warrant extended discussion in the EA.

■ As stated *supra*, information "necessary to determine whether the agency considered all relevant factors and explained its decision" may be admissible even if not part of the agency record. *Ctr. for Biological Diversity*, 450 F.3d at 943. However, post-decision information "may not be advanced as a new rationalization either sustaining or attacking an agency's decision." *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir.1996). Exhibit E was written well after the DR and FONSI were issued for the Project. The BLM could not have considered a document that did not exist at the time of the decision. Accordingly, the

BLM's motion to strike Exhibit E is granted.

## C. Exhibit F.

■ As Exhibit F to their reply in support of their motion for summary judgment, plaintiffs offer a "Boundary Study" dated April 28, 2011, discussing potential expansion of the Cascade–Siskiyou National Monument and referencing studies from the 1990s explaining the importance of protecting entire watersheds to safeguard biodiversity and ecosystem integrity. Plaintiffs argue that Exhibit F should be admitted because it will assist the court in understanding the complex and technical matters that underlie the Project area's potential for inclusion in the Monument. Plaintiffs state that Exhibit F was prepared by a team of scientists "uniquely qualified to explain the biological and ecological criteria that must be considered in determining which areas should be included in the future expansion of the Monument." Plaintiffs also contend that Exhibit F should be admitted as information necessary to determine whether the agency considered all relevant factors in its decision. Plaintiffs argue that references to studies from the 1990s on the importance of protecting entire watersheds show that the BLM disregarded important information regarding watershed protection.

Though the court recognizes exceptions where information is needed determine whether the agency considered all relevant factors, and where supplementation is needed to explain a complex or technical matter, *Ctr. for Biological Diversity*, 450 F.3d at 943, neither exception applies to this case. Exhibit F was written after the final decision for the Project, and, as stated *supra*, the agency could not have considered documents not in existence at the time the decision was made. The BLM's motion to strike Exhibit F is granted.

## D. Exhibits G and H.

■■ As Exhibits G and H, plaintiffs offer maps of a portion of the Soda Mountain Wilderness Area. Exhibit G is a map from of the Soda Mountain Wilderness, prepared prior to its official designation as wilderness, and shows closed roads in the wilderness area. Exhibit H is a map of the same area from after the Soda Mountain Wilderness designation, and does not include closed roads. Plaintiffs allege that the maps contradict BLM's assertion that the presence of roads precludes wilderness designation, and that the maps demonstrate that wilderness designation may actually improve wilderness character. Plaintiffs state that Exhibits G and H should be admitted under two exceptions: (1) to show that the BLM did not consider all relevant factors in its decision, and (2) to clarify technical matters related to the BLM's decision.

The court admits Exhibits G and H under the first exception. The Ninth Circuit recognizes an exception for information "necessary to determine whether the agency considered all relevant factors and explained its decision." *Ctr. for Biological Diversity*, 450 F.3d at 943. The court may look beyond the agency's administrative record to show that an agency has not considered all relevant factors. *Asarco, Inc.*, 616 F.2d at 1160. Here, Exhibits G and H demonstrate that the BLM's statement that the presence of roads precludes wilderness designation may be false. The Project EA states that Project area should not be designated as wilderness in part because of the presence of roads. Because Exhibits G and H demonstrate that the presence of roads may have no impact on an area's designation as wilderness, Exhibits G and H may be necessary to determine whether the BLM properly considered all factors and considered its decision.

Accordingly, the court denies the BLM's motion to strike as to Exhibits G and H.

## LEGAL STANDARDS

### I. APA.

■■ Judicial review of agency decisions under NEPA and FLPMA is governed by Section 706 of the APA and may be resolved through motions for summary judgment. *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205 (9th Cir.2004) ("Because the statutes ... do not contain separate provisions for judicial review, our review is governed by the APA"); *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 964 (9th Cir.2002). Under the APA, the court may set aside a final agency action only where the action is arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with the law. 5 U.S.C. § 706(2)(A). Review under the APA is "searching and careful." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 858 (9th Cir.2005). However, the court may not substitute its own judgment for that of the agency. *Id.* Instead, a court:

> [W]ill reverse a decision as arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1176–1177 (9th Cir.2011) (*quoting Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir.2008) (*en banc*), *abrogated on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)). "Agency action is valid if the agency 'considered the relevant factors and articulat-

ed a rational connection between the facts found and the choices made.'" *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir.2010) (*quoting Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir.2008)).

## II. NEPA.

 "NEPA is 'our basic national charter for protection of the environment.'" *Klamath–Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 993 (9th Cir. 2004) (*quoting* 40 C.F.R. § 1500.1(a)). NEPA is a procedural statute that requires federal agencies, such as the BLM, to assess the environmental consequences of major actions before those actions are undertaken. NEPA has two purposes: (1) to ensure that federal agencies take a "hard look" at environmental consequences to agency actions, and (2) to guarantee that the public has access to relevant information. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

 If a federal agency determines that a proposed action will significantly affect the environment, NEPA generally requires the agency to prepare an EIS. 42 U.S.C. § 4332(2)(C); *Klamath–Siskiyou Wildlands Ctr.*, 387 F.3d at 993. To determine if the environmental impact of a proposed action is significant enough to warrant an EIS, federal regulations permit an agency to conduct a less-exhaustive EA. 40 C.F.R. § 1508.9. An EA is a "concise public document that briefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." *Id.* An EA must "include brief discussions of the need for the proposal, or alternatives [to the proposed action], [and] of the environmental impacts of the proposed action and alternatives." *Id.* In this analysis, the agency preparing an EA must consider "the direct, indirect, and cumulative impacts of the action." *Ctr.*

*For Envtl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1006 (9th Cir.2011) (*citations omitted*). If, after preparing the EA, the agency determines that an EIS is not required, the agency must issue a FONSI. 40 C.F.R. § 1501.4(e). The FONSI should briefly state why the proposed action will not have a significant impact on the human environment. 40 C.F.R. § 1508.13.

 NEPA is accompanied by implementing regulations promulgated by the Council on Environmental Quality ("CEQ"), found at 40 C.F.R. §§ 1501.1–1508.28. These regulations should be construed consistently with the policies embodied in NEPA "to the fullest extent possible." *Klamath–Siskiyou*, 387 F.3d at 993 (*citation omitted*).

## III. FLPMA.

FLPMA establishes standards for public land use planning and obligates the BLM to manage its lands under principles of multiple use. 43 U.S.C. § 1732(a). FLPMA requires the Secretary of the Interior to "develop, maintain, and when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands." 43 U.S.C. § 1712(a). In accordance with FLPMA, the BLM is required to conduct district-level planning to guide public land maintenance and development. The district-level plan in this case, the Medford District Land RMP, was approved in June 1995, and is subject to the NWFP. AR 20044, 20052. Failure of a project to comply with the RMP is a violation of FLPMA and its implementing regulations.

## DISCUSSION

### I. Environmental Impact Analysis.

 NEPA requires federal agencies to take a "hard look" at possible environ-

mental consequences of "major federal actions," including direct and indirect foreseeable effects. *Pac. Rivers Council v. U.S. Forest Serv.,* 689 F.3d 1012, 1024 (9th Cir.2012). An EA for a "major federal action" must contain "sufficient evidence and analysis" for determining whether the project will have a significant impact on the environment. 40 C.F.R. § 1508.9(a)(1). In this analysis, the agency must consider "the direct, indirect, and cumulative impacts of the action." *Ctr. For Envtl. Law & Policy,* 655 F.3d at 1006 (9th Cir.2011).

### A. Cascade–Siskiyou National Monument Expansion.

██ Plaintiffs contend that the EA is inadequate because the BLM failed to take a hard look at the consequences of the Project on potential expansion of the Cascade–Siskiyou National Monument ("the Monument"). The Monument was established by presidential proclamation in 2000 and is currently 58,000 acres. Plaintiffs cite several sources encouraging Monument expansion, including a draft memo from the Department of Interior ("DOI") and a letter from Secretary of the Interior Ken Salazar. The draft memo from the DOI discusses areas potentially suitable for designation as national monuments, and states that the Monument may be a good candidate for expansion. AR 4207–4208. The paragraph relating to the Monument states:

> In 2000, Cascade–Siskiyou National Monument was established to protect the extraordinary biodiversity and vegetation found in southwestern Oregon. Unfortunately, because of political constraints, the Monument's southern boundary was artificially established at the California State line. Therefore, the Monument does not include the ecologically important Klamath River tributaries and cuts out sections of important

ecoregions from protection. Connectivity of landscapes is essential to protect and maintain healthy wildlife populations especially in the face of global climate change. In addition, this expansion could connect Cascade–Siskiyou with the proposed Siskiyou Crest National Monument. Expansions on the Oregon side may also be worth consideration.

AR 4208.

The memo further states that "further evaluations should be completed prior to any final decision, including an assessment of public and Congressional support." *Id.*

The letter from Secretary Salazar asks the DOI's bureaus "to think about what areas might be worth considering for further review for possible special management or Congressional designation." AR 4044. The paragraph relating to Monument expansion states:

> Secretary Salazar believes it is important that the Department of Interior serve as wise stewards of the places that matter most to Americans. For that reason, he has asked DOI's bureaus to think about what areas might be worth considering for further review for possible special management of Congressional designation. The preliminary internal discussion draft reflects some brainstorming discussions within BLM, but no decisions have been made about which areas, if any, might merit more serious review and consideration."

AR 4044.

Plaintiffs argue that these sources, as well as comments from the Oregon Department of Fish and Wildlife, AR 4234–4235, demonstrate a movement for expansion of the Monument. Plaintiffs contend that the fact that the Project area is matrix land, designated for timber production, is not dispositive. Plaintiffs point to

a provision of the NWFP mentioning the "special biological qualities" of the Soda Mountain area as evidence that the Project area deserves special protection. Under a section called "mitigation measures not adopted," the NWFP states:

> Some suggestions that were made on the Draft and Final SEIS, while presenting a reasonable basis for providing special protection for specific areas, will be better and more appropriately considered at the planning unit level in accordance with current land and resource management planning procedures.
>
> The Soda Mountain area near Medford, Oregon is an example. This decision recognizes the special biological qualities of this unique area and directs the BLM to evaluate carefully the values of the Soda Mountain as a biological connectivity corridor and propose any additional management protection necessary, including a special designation, through the BLM resource management plan, to protect those values.

AR 21362–21363.

Plaintiffs contend analyzing the Project area's potential for Monument expansion is consistent with this provision of the NWFP. In response, the BLM argues that it did perform a careful analysis of environmental impacts, there is not a federal government proposal to expand the Monument, the BLM is not required to analyze the future potential for the Project to be included in the Monument, and that the Project would not preclude the area from future inclusion in the Monument.

■ The court agrees with the BLM. As a preliminary matter, the land in the Project area is "matrix lands," designated by the NWFP for long-term timber production. While this designation does not excuse the BLM from compliance with NEPA, *Seattle Audubon Soc'y,* 871

F.Supp. at 1305, the BLM is required to comply with this designation. In addition, while the record demonstrates that there is some support for future expansion of the Monument, the record does not demonstrate that Monument expansion is likely in the Project area. First, the record does not show that there is a federal proposal for Monument expansion. The draft memo from the DOI cautions that further review of any area would need to be done prior to any proposal for Monument expansion, and the record does not indicate that further review has taken place. Secondly, if the Monument were expanded, it is not clear from the record that the Project area would be the addition. Indeed, the draft memo from the DOI focuses primarily on expansion into California, not into Oregon. AR 4208. The statement that expansion of the Monument into Oregon "may also be worth consideration" cannot be read as an endorsement for the inclusion of the Project area in the Monument, and the letter from Secretary Salazar discusses Monument expansion in even more general terms. AR 4044. The record before the court does not establish that there is support for including the Project area in the Monument. While an agency may not "shirk [its] responsibilities under NEPA by labeling any and all discussion of future environmental effects as crystal ball inquires," *Selkirk Conservation Alliance v. Forsgren,* 336 F.3d 944, 962 (9th Cir.2003) (*citations omitted*), NEPA does not require an agency to speculate on future events. The record does not show that there is a current government plan of proposal for Monument expansion, and thus the BLM did not violate NEPA by failing to consider the area's potential for inclusion in the Monument.

**B. Wilderness Designation.**

■ Plaintiffs also contend that the BLM did not take a hard look at the

impacts of the Project on the area's wilderness character and potential to be designated as wilderness. Under the Wilderness Act of 1964, conserving land with "wilderness characteristics" is a national priority. 16 U.S.C. § 1132. Pursuant to the Wilderness Act, the BLM is required to inventory the public land it administers for wilderness characteristics. *Or. Natural Desert Ass'n v. BLM*, 625 F.3d 1092, 1098 (9th Cir.2010). If the BLM determines that land has wilderness characteristics, the land may be "designated wilderness" by grant of Congress. *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 59, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004).

Pursuant to 16 U.S.C. § 1131(c), land has wilderness characteristics if it:

(1) Generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable;

(2) Has outstanding opportunities for solitude or a primitive and unconfined type of recreation;

(3) Has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and

(4) May also contain ecological, geological, or other features of scientific, educational, scenic, or historic value.

 While the BLM must inventory and consider an area's potential for designation under the Wilderness Act, it need not conduct a new inventory every time it proposes a project. *Or. Natural Desert Ass'n v. Shuford*, CIV. 06–242–AA, 2007 WL 1695162 at *6 (D.Or. June 8, 2007). However, if there is a change of circumstances in the project area, a new inventory may need to be done. *Or. Natural Desert Ass'n v. Rasmussen*, 451 F.Supp.2d 1202, 1211 (D.Or.2006). Additionally, the BLM must base its decision on an "adequate baseline of resource information to satisfy NEPA's 'hard look' requirement." *Shuford*, 2007 WL 1695162 at *4.

Plaintiffs contend that the southernmost Project units (19–2, 19–3, 32–1, 32–2, 32–3), which are part of the Greensprings Mountain portion of the South Cascades Wilderness Proposal, AR 3645, were not thoroughly assessed for wilderness designation potential. AR 3645. The BLM performed an inventory of this area in 2006, which found that the area did not have wilderness characteristics because (1) the presence of old harvest units in the area negated the "naturalness" factor; (2) the area's location within a rural interface negated the "outstanding opportunities for solitude" factor; and (3) the area lacked sufficient acreage to meet the 5,000–acre requirement. AR 6741–6746. Plaintiffs argue that the 2006 wilderness inventory was fundamentally flawed, as it was conducted in the shadow of the George W. Bush administration's "no more wilderness" directives and relied on a short, six-page form that did not require the agency to elaborate on its conclusions. Plaintiffs contend that the record contains evidence showing that the area possesses wilderness characteristics, and that the BLM's failure to conduct a new inventory violates NEPA. The BLM argues that the 2006 wilderness inventory was sufficient, and that the record contains adequate evidence that the area lacks wilderness characteristics.

#### 1. Naturalness

The first requirement for an area to contain wilderness characteristics is that the area "[g]enerally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable." 16 U.S.C. § 1131(c)(1). The 2006 inventory determined that the area did not meet this "naturalness" re-

quirement due to the presence of old harvest units in the area. AR 6744. Plaintiffs argue that the presence of harvest units is not dispositive, as the BLM need consider not only the present condition of an area, but also whether it could return to a natural condition. Plaintiffs argue that most evidence of human activity, such as the harvest units, is "already being naturally reclaimed," and thus the 2006 inventory's evaluation of "naturalness" was incorrect and should not have been relied on in the Project EA.

The BLM contends that the 2006 inventory was adequate, and that even if the old harvest units are being naturally reclaimed, the record shows other factors negating the area's "naturalness," including the presence of roads. The BLM cites *Oregon Natural Desert Association v. BLM* for the principle that "BLM has long treated the presence of roads as cancelling out any other wilderness characteristics an area might otherwise have, as they defeat the 'natural conditions' wilderness characteristic." 625 F.3d at 1107. In response, plaintiffs offered Exhibits G and H, two maps of the Soda Mountain Wilderness. Exhibit G is from prior to the area's designation as wilderness, and shows a number of closed roads. Exhibit H is from after the area's designation as wilderness, and does not contain any roads. Plaintiffs argue that the maps demonstrate that the BLM does not consider the presence of roads as a factor canceling out other wilderness characteristics.

## 2. Opportunities for solitude.

The second factor in determining whether an area has wilderness characteristics is whether the area "[h]as outstanding opportunities for solitude or a primitive and unconfined type of recreation." 16 U.S.C. § 1131(c)(2). The 2006 wilderness inventory relied on by the BLM stated that there were not opportunities for solitude based on the area's proximity to a rural interface. AR 6744. During oral argument, the BLM stated that "rural interface" refers to the presence of four residences in the Project area. Plaintiffs argue that the four residences are insignificant, citing, among other sources, the BLM's Handbook on Wilderness Inventory and Study Procedures statement that "[s]ome human works are acceptable so long as they are substantially unnoticeable." Dugan Decl. Ex. I at 11.[7]

## 3. Sufficient acreage.

The third factor in determining whether an area has wilderness characteristics is whether the area "[h]as at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition." 16 U.S.C. § 1131(c)(3). The 2006 inventory stated that the Greensprings Mountain portion of the South Cascades Wilderness Proposal lacked sufficient acreage because it is 2,366 acres. AR 6742. Plaintiffs contend that the fact that the area is less than 5,000 acres is not dispositive, as it is "of sufficient size as to make practicable its preservation and use in an unimpaired condition." 16 U.S.C. § 1131. Plaintiffs note that about 4,700 acres of private lands adjacent to the west of the project area have significant conservation and natural value, and that the BLM could have requested funds from Congress to purchase private lands to create a wilderness area exceeding 5,000 acres. Plaintiffs point to *Muckleshoot Indian Tribe v. United States*

---

7. Agency manuals do not have the full force and effect of the law (*see Schweiker v. Hansen,* 450 U.S. 785, 789, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981)). However, BLM employees are "obliged to follow the terms and instructions of its manual." *Robert Glenn,* 124 IBLA 104, 108 (1992).

*Forest Service,* where the court held that the purchasing of private lands was a feasible approach to public lands planning. 177 F.3d 800, 814 (9th Cir.1999). In response, the BLM contends that *Muckleshoot* is distinguishable, as the case involved a proposed land exchange between the Forest Service and a company, *Id.* at 803, while the case at hand involves a timber sale on land that the BLM already owns.

#### 4. Analysis.

 Though the court understands plaintiffs' skepticism of the thoroughness and correctness of the 2006 inventory, the court does not find that the BLM's reliance on the inventory for the Project EA was arbitrary and capricious. The 2006 inventory considered the requisite area's naturalness, opportunities for solitude, and acreage. While the 2006 inventory's support for its conclusions is limited, the inventory considered the factors it was required to and documented its findings. The court should defer to agency decisions so long as the agency's conclusions are supported by studies the agency deems reliable. *Native Ecosystems Council v. Weldon,* 697. F.3d 1043, 1053 (9th Cir.2012) (*citing N. Plains Res. Council, Inc. v. Surface Transp. Bd.,* 668 F.3d 1067, 1079 (9th Cir.2011)). In this case, the court cannot find that the BLM's decision to rely on the 2006 inventory was arbitrary and capricious.

#### C. Potential impact on sensitive bat species.

 Plaintiffs also make the argument that the EA is inadequate for not discussing the impacts of proposed logging on sensitive bat species. Sensitive species are those "whose viability is of concern because they have significant downward trends in numbers or density, or because there is a significant downward trend in their current or predicted habitat that would reduce their distribution." *Friends of the Wild Swan, Inc. v. U.S. Forest Serv.,* 966 F.Supp. 1002, 1009 (D.Or.1997). The BLM is required to carry out management activities "consistent with the principles of multiple-use for the conservation of proposed, candidate, BLM sensitive and state sensitive species and their habitats." BLM Manual, Special Status Species Management, 6840 (July 2008).[8] Several bat species in the project area have been listed as "sensitive," including the fringed myotis bat and the Pacific pallid bat. AR 4797. The EA states that the habitat for these species will not be impacted because the Project would retain adequate levels of snags and broken-top trees. AR 4797. Plaintiffs argue that the EA does not properly address bat habitat because the EA does not state the number of snags and broken-top trees to be felled, nor state the amount of bat habitat in the project area that will be impacted by the Project.

In reference to snags, the EA wildlife guidance objectives state:

(1) Reserve from harvest a minimum of 3 snags per acre greater than 17 inches dbh, where available. Retention of snags greater than 17 inches dbh within the interior of the stands would mitigate impacts to cavity-dependent species.

(2) Do not mark large, broken-top trees and large snags with loose bark. Retain and protect these structure where possible.

AR 4717.

In reference to broken-top trees, the silviculture objectives of the EA state that

8. The BLM manual is available online at http://www.blm.gov/wo/st/en/info/regulations/ Instruction_Memos_and_Bulletins/blm_manual.html.

the purchaser should "[i]n general, mark ... trees with broken or forked tops," but also state that "[s]ome diseased, forked-top trees, and dying and dead trees should remain," and directs the purchaser to "[a]void the harvest of old-growth trees." AR 4705. Under the wildlife guidance objectives, the EA also states "[d]o not mark large, broken-top trees and large snags with loose bark." EA 4717.

Plaintiffs contend that the EA should contain the specific number of retained snags and the amount of impacted bat habitat. Plaintiffs further contend that the EA is inadequate because the objectives regarding both snags and broken-top trees are contradictory, as they promote both harvesting and retention.

■ An EA need not "compile an exhaustible examination of each and every tangential event that could impact the local environment." *Tri–Valley CAREs v. DOE*, 671 F.3d 1113, 1129 (9th Cir.2012). Rather, an EA should "create a workable public document that *briefly* provides evidence and analysis for an agency's finding regarding an environmental impact." *Id.* In this case, the court finds that the Project EA provided adequately detailed analysis on snag retention. The court further finds that the listed objectives are not contradictory. In reference to snags, both of the objectives in the wildlife guidance objectives may be met simultaneously. The Project EA favors retention of "large" snags—that is, snags greater than 17 inches diameter at breast height ("dbh")— and simultaneously allows for some harvesting of smaller snags. The court does not find that the objectives regarding snag retention are unclear or contradictory. Similarly, in reference to broken-top trees, the court finds that both objectives can be met at the same time. The Project EA favors retention of large and old-growth broken-top trees, and allows for harvesting

of younger and smaller broken-top trees. Accordingly, the court does not find that BLM's analysis in the EA of the Project's impact on sensitive bat species was arbitrary and capricious.

**II. Cumulative Impacts Analysis.**

Pursuant to NEPA, federal agencies must analyze the cumulative environmental impacts of major federal actions. 42 U.S.C. § 4332(2)(C). A cumulative impact is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions ... Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7. According to the BLM NEPA Handbook, "[R]easonably foreseeable future actions are those for which there are existing decisions, funding, formal proposals, or which are highly probable based on known opportunities and trends." BLM NEPA Handbook H–1790–1 (Jan. 2008) at 59. The consideration of past, present, and reasonably foreseeable future actions must contain enough quantified or detailed information to allow for a "useful analysis." *Kern v. BLM*, 284 F.3d 1062, 1075 (9th Cir.2002). "[G]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Id.*

While an EA is less comprehensive than an EIS, an EA that does not include a cumulative impact analysis or tier to an EIS with a cumulative impact analysis may be deficient. *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 895–896 (9th Cir.2002). The fact that more EAs are prepared than EISs demonstrates the need for detailed cumulative impact analyses in EAs. "[I]n a typical year, 45,000 EAs are prepared to 450 EISs ... Given

that so many more EAs are prepared than EISs, *adequate consideration of cumulative effects requires that EAs address them fully.*" *Kern,* 284 F.3d at 1076 (*quoting* CEQ, *Considering Cumulative Effects under the National Environmental Policy Act* at 4, January 1997). In reviewing EAs for timber sales, the need for a comprehensive cumulative impact is particularly pronounced. "As we have previously emphasized when considering the sufficiency of a timber sale EA, without a consideration of individually minor but cumulatively significant effects, 'it would be easy to underestimate the cumulative impacts of the timber sales . . ., and of other reasonably foreseeable future actions, on the [environment].'" *Dombeck,* 304 F.3d 886 at 896 (*citing Kern,* 284 F.3d at 1078).

## A. Cumulative Impacts of the Cottonwood Project.

Plaintiffs contend that the Sampson Cove EA is inadequate because it fails to properly consider the cumulative impacts of the other reasonably foreseeable future timber sales. Plaintiffs' arguments on this point center on the failure of the Sampson Cove EA to consider the Cottonwood Forest Management Project ("the Cottonwood Project"), a timber sale adjacent to the Sampson Cove Project scoped in October 2010. AR 3283. According to the Cottonwood EA, the Cottonwood Project involves timber harvest on 1,108 acres and 1.5 miles of new road construction. AR 568. Some of the Samson Cove Project units and Cottonwood Project units are immediately adjacent, Supp. Dugan Decl., Ex. M, separated by a road or the Pacific Crest National Scenic Trail. Six acres from the Sampson

Cove Project overlap into the Cottonwood Project analysis area. AR 604.

Plaintiffs argue that the Sampson Cove EA is inadequate for failing to mention and analyze the cumulative effects of the Cottonwood Project. Though the Cottonwood EA was not issued until October 2010, after the DR and FONSI for the Sampson Cove Project were issued, plaintiffs contend that the BLM was planning both sales at the same time. Plaintiff notes that the BLM had an interdisciplinary team ("IDT") meeting in January 2010 discussing spreading out the due dates for six timber sales, including the Sampson Cove Project and the Cottonwood Project, and another IDT meeting in June 2010 specifically focused on the Cottonwood Project. Dugan Decl. Ex. A; AR 1095–1096. Plaintiffs argue that because these events occurred before the Sampson Cove EA was issued in July 2010, the Cottonwood Project was "reasonably foreseeable" and thus should have been included in the cumulative impacts analysis of the Sampson Cove EA.

In its briefing, the BLM argues that the Cottonwood Project did not need to be included in the Sampson Cove EA, because the Cottonwood Project "was not yet proposed and there was no information to disclose." The BLM contends that a project is not "reasonably foreseeable" until a scoping notice for the project is issued, and that the Cottonwood Project scoping notice was not issued until October 29, 2010, several months after the decision for the Sampson Cove Project was made.[9] AR 4042, 4049.

9. The BLM also makes the argument in its briefing that the Cottonwood Project did not need to be included in the Sampson Cove EA cumulative impact analysis because the chosen cumulative impacts analysis area for Sampson Cove is the upper region of the Bear

Creek Watershed, and the Cottonwood Project is in the Jenny Creek Watershed. Given the court's method of resolving this issue, the court does not reach this point in detail. However, the court notes that several units (32–1 and 32–2) of the Sampson Cove Project

Projects need not always be finalized or scoped before they warrant inclusion in the cumulative impacts section of a project EA. While "NEPA does not require the government to do the impractical," *Inland Empire Public Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 764 (9th Cir.1996), "[i]t is not appropriate to defer consideration of cumulative impacts to a future date when meaningful consideration can be given now." *Kern*, 284 F.3d at 1075. A project may be meaningfully considered before it is finalized. As the court stated in *Surfrider Foundation v. Dalton*, 989 F.Supp. 1309, 1324 (S.D.Cal.1998), "[a] project need not have received final approval to be 'reasonably foreseeable.' The term 'reasonably' suggests that the agency must make a good faith effort to consider likely cumulative effects." *See also N. Plains Res. Council, Inc.*, 668 F.3d at 1078 ("[P]rojects need not be finalized before they are reasonably foreseeable").

The United States District Court for the Western District of Washington analyzed a case similar to the one at hand, and determined that some projects may be reasonably foreseeable before a scoping notice is issued. *N. Cascades Conservation Council v. U.S. Forest Serv.*, 98 F.Supp.2d 1193 (W.D.Wa.1999). Environmental groups brought suit against the United States Forest Service ("USFS"), alleging that an EA for an off-road vehicle trail construction project (the "Goose–Maverick Project") improperly failed to analyze the cumulative effects of a second trail construction project (the "Ramona Project"). The USFS contended that the Ramona Project did not need to be included in the Goose–Maverick Project EA because the Ramona Project's scoping notice had not been issued. *Id.* at 1197. The court disagreed, holding that several documents in the record indicated that the Ramona Project was reasonably foreseeable within the meaning of 40 C.F.R. § 1508 at the time of the Goose–Maverick EA. *Id.* In particular, the court noted that the USFS had listed both projects in a "Schedule of Proposed Actions" around half a year before the Goose–Maverick EA, and that the USFS issued a second "Schedule of Proposed Actions" discussing the Ramona Project in more detail just prior to the Goose–Maverick EA. *Id.* The court concluded that while public scoping of the Ramona Project did not occur until months after the Goose–Maverick EA was issued, enough was known about the Ramona Project at the time the Goose–Maverick EA was issued that the Ramona project was a reasonably foreseeable proposal whose cumulative effects warranted consideration in the Goose–Maverick EA. *Id.*

In this case, the Cottonwood Project warranted consideration in the Sampson Cove EA. When the EA for the Sampson Cove Project was issued, the Cottonwood Project was not merely contemplated; rather, the BLM had had several meetings discussing the Cottonwood Project and had developed certain prescriptions for the Cottonwood Project. AR 1095–1096. The Ashland IDT met on January 27, 2010, to discuss the dates for the multiple timber sales. Dugan Decl., Ex. 1. In reference to the Cottonwood Project and two other timber sales, the agenda from the meeting states that the specialist due dates were moved to extend the timber sales: "In order to spread the due dates out more for the 2011 timber sales, we changed the

---

are actually located in the Jenny Creek Watershed. AR 4737; Def. Reply, p. 12. While agencies are afforded considerable deference regarding the selection of a cumulative impacts analysis area, *Kleppe v. Sierra Club*, 427 U.S. 390, 414, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976), the cumulative impacts analysis area for a harvest sale should, at a minimum, include all of the harvest sale units in the project area.

specialist due dates for Cottonwood EA to November 2, 2010; to February 15, 2011 for Rio Climax, and to June 1, 2011 for Sweeper." *Id.*

On June 30, 2010, BLM held a "Cottonwood IDT Meeting" with thirteen BLM attendees to specifically discuss the Cottonwood Project. AR 1095–1096. The two-page agenda from this meeting indicates that the BLM had made certain decisions about the Cottonwood Project. *Id.* Indeed, in reference to hydrology, the agenda notes twice that the Cottonwood Project would occur in a key watershed. AR 1095, 1096. Additionally, under a section titled "Wildlife," the agenda notes that there are "[n]o [northern spotted owl] nest sites or Bald Eagle sites in [the Cottonwood Project] area," and that there are "5 new [great gray owl] sites within [the] Cottonwood area." AR 1095. These statements indicate that the BLM had identified the Cottonwood Project area and had completed certain studies for the area. Further, in reference to silviculture prescriptions, the agenda demonstrates that the BLM had identified the silviculture treatments it would use for the Cottonwood Project ("Silviculture prescriptions will be similar to Plateau Thin's with a disease management component") was knowledgeable about the area's forest stands ("Most stands have been previously harvested"), and was planning further exams to finalize its recommendations ("need to do stand exams to confirm and fine tune prescriptions and marking guidelines"). AR 1095.

While the Cottonwood Project had not been scoped when the Sampson Cove EA was issued on July 9, 2010, the BLM knew that the area for the Cottonwood Project would be a key watershed adjacent to the Sampson Cove Project, had identified the silviculture prescriptions to use, and was determining which surveys and exams had been completed and which ones still needed to be done. At the time the Sampson Cove EA was issued, the Cottonwood Project was certainly a "reasonably foreseeable" project warranting meaningful consideration in the Sampson Cove EA.

Plaintiffs argue that the BLM was planning both projects at the same time, and essentially only issued the Cottonwood scoping notice at a later date to avoid either putting both projects in a collective EA or EIS, or performing a cumulative impact analysis for the Sampson Cove EA that included the Cottonwood Project. The court does not assume that the BLM's timing of the two projects was in bad faith, nor does it speculate on whether the BLM's decision would have been different if the cumulative impacts of the Cottonwood Project had been analyzed in the Sampson Cove Project EA. However, if an EA or EIS is not required to discuss a planned, nearby project until that nearby project's scoping notice is issued, then an agency could purposefully delay issuing the nearby project's scoping notice until the EA or EIS is complete. One of NEPA's primary goals is to ensure that the public has access to information regarding potential agency projects and the opportunity to provide informed comments *before* a final decision is made. *Citizens for Better Forestry v. U.S. Dep't of Agric.,* 341 F.3d 961, 970–71 (9th Cir.2003) (*citations omitted*). Indeed, "NEPA's public comment procedures are at the heart of the NEPA review process." *State of Cal. v. Block,* 690 F.2d 753, 770 (9th Cir.1982). At the time the Sampson Cove EA was issued, the public had no notice that the BLM was engaged in significant preparation for an adjacent timber sale. The fact that a scoping notice had not been issued for the Cottonwood Project does not excuse the BLM from discussing this reasonably foreseeable project in the EA for Sampson Cove. Accordingly, the court

finds that the BLM's failure to mention and consider the Cottonwood Project in the Sampson Cove EA is arbitrary and capricious in violation of NEPA.

## B. Cumulative Impacts of the Shale City Project.

Plaintiffs also contend that the Sampson Cove EA is inadequate for failing to properly analyze the cumulative impacts of the Shale City Project.[10] The Shale City Project is a small roadside salvage timber sale to harvest dead and dying trees on thirty-eight acres alongside roads. Supp. Dugan Decl., Ex. K. Five acres of the Shale City Project are adjacent to the Sampson Cove Project area. *Id.* The Project EA mentions the Shale City Project and states that "[n]ew ground disturbance would be limited," and that "no new road construction or reconstruction is proposed." AR 4744. The Project EA further states that the Shale City Project "would not be expected to affect any special status wildlife species" and that "[n]o direct or indirect effects to aquatic habitats are anticipated." AR 4800, 4749. Plaintiffs assert that this analysis is too cursory.

While the court is mindful that the cumulative impact analysis of other projects must "provide objective quantifications of the impacts," *Klamath–Siskiyou*, 387 F.3d at 994, and be more than a mere mention of other projects, the court does not find that the EA was inadequate in its analysis of the Shale City Project. The EA states that the Shale City Project is extremely small, limited to removing trees from roads, and that ground disturbance and other environmental impacts would be limited. The court finds that in reference to the cumulative impacts analysis for the Shale City Project in the Sampson Cove EA, the BLM met its burden.

## C. Cumulative Impacts of the Plateau Thin Project.

Plaintiffs further argue that the Sampson Cove EA is inadequate for failing to address the cumulative impacts of the Plateau Thin Project in the Sampson Cove EA. The Plateau Thin Project is a timber sale located in the Upper Jenny Creek sub-watershed. AR 627. Information is not available in the record or in the parties' briefs about the Plateau Thin Project's size or specific location within the sub-watershed. Because the court does not have sufficient information before it to analyze whether the Sampson Cove EA should have included the Plateau Thin Project in its cumulative impact analysis, the court does not reach this issue.

## III. Failure to prepare an EIS.

█ Plaintiffs argue that the BLM erred in failing to prepare an EIS for the Project. NEPA requires an EIS for any major federal action that may significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(C). Plaintiffs contend that because the Project may significantly affect the environment, the BLM violated NEPA by preparing only an EA rather than an EIS.

█ An agency must prepare an EIS when there are substantial questions about whether a project may cause significant effects on the human environment. Whether a project may significantly affect the environment requires the agency to consider the context and intensity of the

10. In their memo in support of their motion for summary judgment, plaintiffs also alleged that grazing allotment renewals in the Project area should have been included in the Sampson Cove EA's cumulative impact analysis. Pltf. Memo, pp. 25–26. Plaintiffs did not discuss this issue in their response or during oral argument, however, and thus the court does not consider it.

project. C.F.R. § 1508.27; *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1185 (9th Cir.2008). Context examines the scope of the agency's action, while intensity examines the degree to which the agency action affects the local area. *Id.* When reviewing an agency's determination of whether to prepare an EIS, courts should determine whether the agency took a "hard look" at the consequences of its action by determining whether the agency's decision was based on a consideration of the relevant factors and contained a convincing statement of reasons why potential environmental impacts are insignificant. *Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1211 (9th Cir.1998).

NEPA regulations list ten "intensity" factors used by agencies when determining whether an EIS is warranted. 40 C.F.R. § 1508.27(b). In certain circumstances, a single intensity factor may be enough to require an EIS rather than an EA. *Ocean Advocates,* 402 F.3d at 865. Plaintiffs argue that the Project meets two of the ten intensity factors.

Plaintiffs argue that the first intensity factor, "unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas," 40 C.F.R. § 1508.27(b)(3), is met by the Project's proximity to the Monument and potential for wilderness designation. However, the BLM's decision that the Project area lacks wilderness characteristics is entitled to deference, and the Monument is not an "ecologically critical area." Additionally, the EA considers the ecological characteristics of the Project area, including the area's soils, water resources, botanical plants, terrestrial wildlife, fish and aquatic habitat, and vegetation. AR 4728–4815.

Plaintiffs also contend that the "degree to which the effects on the quality of the human environment are likely to be highly controversial," 40 C.F.R. § 1508.27(b)(4) is also met, as demonstrated by the protests by plaintiffs and "a large amount of scientific information" regarding the Project that the BLM disputed during the administrative process. A project is "controversial" when there is a " 'substantial dispute [about] the size, nature, or effect of the major Federal action rather than the existence of opposition to a use' " *Blue Mountains,* 161 F.3d 1208, 1212 (9th Cir.1998) (*citations omitted* ). Mere disagreements about scientific matters within the purview of the agency do not make a project highly controversial. *Klamath–Siskiyou,* 387 F.3d at 993. Where resolution of an issue "requires a high level of technical expertise," it is "properly left to the informed discretion of the responsible federal agencies." *Kleppe,* 427 U.S. at 412, 96 S.Ct. 2718. Courts should be particularly deferential when the agency is " 'making predictions, within its [area of] special expertise, at the frontiers of science.' " *Forest Guardians v. U.S. Forest Serv.,* 329 F.3d 1089, 1099 (9th Cir. 2003) (*citations omitted* ). That is, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Or. Natural Res. Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

In this case, plaintiffs argue that there are substantial disputes about the effect of the Project on fire risk, on potential designation of the Project area as wilderness, and on the potential for the Project area to be part of the Monument. Plaintiffs point to fire ecology studies submitted by commenters disputing the

BLM's determination that the Project's impact on fire risk would be minimal, and comment cards and letter submitted by citizens regarding wilderness designation and Monument expansion. In reference to the studies submitted about fire risk, the court finds that the BLM adequately analyzed and considered fuel treatment and fire risk. While the studies submitted by plaintiffs offer different conclusions, the BLM is awarded considerable deference on issues requiring high levels of technical expertise. *Marsh*, 490 U.S. at 377, 109 S.Ct. 1851. In reference to the Project area's potential for wilderness designation and Monument inclusion, the court finds that, as stated *supra*, neither designation of the Project area as wilderness nor inclusion of the Project area in the Monument is likely. Accordingly, the Project is not highly controversial within the meaning of 40 C.F.R. § 1508.27(b)(4).

## IV. Coarse Woody Material Retention.

██ Plaintiffs allege that the BLM violated FLPMA by incorrectly applying Medford RMP standards and guidelines for coarse woody material in its EA. Plaintiffs also allege that the BLM violated NEPA by failing to disclose the alleged inconsistency with RMP standards.

Pursuant to FLPMA, the BLM is required to follow the RMP for the district. 43 U.S.C. § 1732(a); 43 U.S.C. § 1712. The RMP incorporates the NWFP. AR 20052. The Medford RMP requires the BLM to retain minimum quantities of coarse woody material to ensure habitats for cavity-nesting birds. Coarse woody material is standing dead trees ("snags") and downed logs. The RMP and NWFP requires that the BLM "[r]etain snags and green trees within a timber harvest unit at levels sufficient to support species of cavity-nesting birds at 40 percent of potential population levels," and "[m]eet the 40 percent minimum throughout the Matrix with per-acre requirements met on average areas no larger than 40 acres." AR 20088, 21499. The RMP and NWFP state that the BLM must leave "a minimum of 120 linear feet of logs per acre greater than or equal to 16 inches in diameter and 16 feet long." AR 20087, 21497.

Plaintiffs contend that the BLM did not comply with the RMP because the Project EA reports the current quantity of coarse woody material as an average over the entire Project area, rather than on areas no larger than 40 acres. The EA provides:

Measurements of coarse woody material totaled 25,200 feet of transect line. The average amount of coarse woody material (CWM) equated 11.4 tons per acre. CWM ranged from 3.6 to 125.2 tons per acre. The coarse woody material stems were mostly concentrated in the 4–7 and 8–11 inch classes at the large end, although some sites contained pieces between 44 and 60+ inches large end diameter. The average total length per acre equaled 1,726.6 feet. Coarse woody material was distributed across all decay classes, although decomposition classes 3 (twigs and branches gone but bole is still round, hard, and in large pieces) and 4 (losing form) were most common.

AR 4820.

Plaintiffs also point to the December 2011 decision on plaintiff Center for Biological Diversity's project, where the BLM stated that "the EA discussed the inventory of Coarse Woody Material conducted for the Sampson Cove Management Project and provides a summary of information in terms of averages across the project area. This provides information on current conditions regarding coarse woody material." AR 278. Plaintiffs contend that the EA and this statement mean that the BLM improperly averaged coarse

woody material availability over the 504–acre Project area, rather than over areas no larger than 40 acres.

The RMP requires that certain levels of coarse woody material or merchantable timber remain *after* a project is implemented. AR 20088. That is, the RMP does not state that before a project is implemented, the per-acre requirements must be met on a per-acre basis on areas no large than 40 acres. Indeed, the RMP contains a provision where the per-acre requirements cannot be met with current amount of coarse woody material, stating "Leave a minimum of 120 linear feet of logs per acre ... Where this management action/direction cannot be met with existing coarse woody debris, merchantable material will be used to make up the deficit"). AR 20087. The proper focus, then, is on whether the Project EA's requirements for retention clearly comply with the RMP, not whether the requirements are measured in a certain matter prior to harvest.

 The court finds that the Project EA is consistent with the RMP. The EA states that the purchaser shall "[a]ssure retention of minimum levels of coarse woody debris and recruitment snags as specified in the Standards and Guidelines on p. C–40 in the Northwest Forest Plan ROD." AR 4713, 4714. Page C–40 of the NWFP states that· "a minimum of 120 linear feet of logs per acre greater than or equal to 16 inches in diameter and 16 feet long should be retained." AR 21497. Page C–40 further states that "[i]n all cases, standards and guidelines from current plans and draft plan preferred alternatives apply if they provide greater amounts." AR 21497. The RMP, which qualifies as a current plan, clearly requires that harvesting "[m]eet the 40 percent minimum throughout the Matrix with per-acre requirements met on average areas

no larger than 40 acres." AR 20088. While the EA itself does not specifically state the retention numbers .and averaging areas for coarse woody material retention, the EA references documents that do. Under FLPMA, the BLM has "a great deal of discretion in deciding how to achieve" compliance with an RMP. *Norton*, 542 U.S. at 66, 124 S.Ct. 2373. The court finds that the EA's discussion of coarse woody material is adequate and does not violate FLPMA. Because there were no inconsistencies between the RMP and EA to disclose, the court finds that the discussion of coarse woody material also does not violate NEPA.

## V. Green Tree Retention.

Plaintiffs contend that the BLM violated FLPMA by failing to comply with RMP and NWFP requirements for green tree retention, and that the BLM violated NEPA by failing to disclose this alleged inconsistency. The NWFP requires that for land administered by the BLM south of Grants Pass, Oregon, which includes the Project area, 16 to 25 large green trees be retained per acre in harvest units in any project. AR 21499. Large green trees are trees at least 20"· dbh. AR 20242. Plaintiffs contend that the EA indicates that the BLM will leave as few as six .trees per acre in "disease-management" units, in violation of the NWFP and RMP. AR 4709. The EA states that for the five disease-management units—units with less than 40% canopy that are continuing to deteriorate from disease—the Project would leave "at least 6 to 8 trees per acre." AR 4709. Plaintiffs contend that the NWFP provides no exceptions for disease-management units, and is required to retain 16–25 large green trees per acre in all units.

While the EA on its face appears to violate the 16–25 large green tree reten-

tion requirement, the Project was modified in May 2012 to comply with the NWFP and RMP. The record indicates that on May 8, 2012, the BLM and the Project's high bidder, Boise Cascade Wood Products, signed a contract modification which removed the five disease management units from the Project. AR a–ff. The modification provides:

> Pursuant to BLM's authority to include provisions peculiar to the sale area (43 C.F.R. § 5234.0–6(c)) and authority to modify contracts (43 C.F.R. § 5470), the BLM has decided to revise the Sampson Cove Timber Sale. While the BLM is not prepared to award the timber sale contract at this time, the future award of the Sampson Cove Timber Sale will be contingent upon your company's acceptance of Modification # 1. By signing this agreement, you are acknowledging that future award of the Sampson Cove Timber Sale will be contingent upon your company's acceptance of Modification # 1.[11]

AR a.

▆▆▆▆ The contract was signed by the BLM and Boise Cascade Wood Products in May 2012. The court finds that based on the contract modification, the Project complies with the green tree retention requirements, and thus does not violate FLPMA. In reference to plaintiff's NEPA claim for failing to disclose the EA's noncompliance with the RMP and NWFP, the court agrees with the BLM that NEPA does not require "an analysis of the proposed action's compliance with other laws." *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. USFS*, 883 F.Supp.2d 979, 994 (D.Or.2012).

**CONCLUSION**

For the reasons stated above, the court concludes that the BLM violated NEPA by failing to address the cumulative impacts of the Sampson Cove Project in combination with the Cottonwood Project. The court finds that the BLM otherwise complied with NEPA, and has complied with FLPMA.

**RECOMMENDATION**

Based on the foregoing, the BLM's motion to strike is granted in part and denied in part (# 31), and it is recommended that plaintiffs' motion for summary judgment (# 17) be granted in part and denied in part, and the BLM's motion for summary judgment (# 23) be granted in part and denied in part.

It is further recommended that this matter be remanded to the BLM so that it may prepare a supplemental EA consistent with this report and recommendation, and that the BLM be enjoined from implementing the Sampson Cove Project while the proceedings required on remand are pending.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Federal Rule of Appellate Procedure 4(a)(1) should not be filed until entry of the district court's judgment or appealable order. The Report and Recommendation will be referred to a district judge. Objections to this Report and Recommendation, if any, are due 14 days from today's date. If objections are filed, any response to the objections is due 14 days from the date of the objection. *See* FED.R.CIV.P. 72, 6.

---

**11.** Modification # 1 provides in part that the disease management units, 1–2b, 1–3, 1–4, 9–2, and 15–2, will be removed. AR b.

DATED this 30th day of November, 2012.